[L. A. No. 23043. In Bank. Jan. 24, 1957.]

THE IVANHOE IRRIGATION DISTRICT, Plaintiff and Appellant, v. ALL PARTIES AND PERSONS, etc., Defendants; COURTNEY McCRACKEN et al., Respondents; THE PEOPLE, Defendant and Appellant.

604

605

E. I. Feemster, James R. McBride, Ralph M. Brody, Edmund G. Brown, Attorney General, B. Abbott Goldberg and Adolphus Moskovitz, Deputy Attorneys General, for Appellants.

Roy A. Gustafson, District Attorney (Ventura), James E. Dixon, Deputy District Attorney, J. Lee Rankin, Solicitor General of the United States, Perry W. Morton, Assistant Attorney General, David R. Warner and Roger P. Marquis, Attorneys, Department of Justice, as Amici Curiae on behalf of Appellants.

Horton & Knox, Harry W. Horton, M. A. Bailey, W. R. Bailey, Henry Holsinger, Principal Attorney, Division of Water Resources, and Gavin M. Craig, Senior Attorney, for Respondents.

Brobeck, Phleger & Harrison, Herman Phleger, Alvin J. Rockwell, John M. Naff, Jr., Edson Abel, Sherwood Green and Green, Green & Bartow as Amici Curiae on behalf of Respondents.

SHENK, J.—The plaintiff Ivanhoe Irrigation District and certain of the defendants appeal from a judgment refusing to confirm a proposed contract between, the United States, acting by and through the Bureau of Reclamation of the Department of the Interior, and the district. The contract provides for the delivery of a supply of water for irrigation purposes from the Central Valley Project and for the construction of a distribution system to make the water available for beneficial use on the lands within the district.

On September 23, 1949, the plaintiff district, purporting to act under the Irrigation District Federal Cooperation Law (Wat. Code, § 23175 et seq.), entered into the contract with the United States. As required by law the contract was approved by the California Districts Securities Commission, but with reservations (Wat. Code, §§ 23222 and 24253), and by the district's electors (Wat. Code, § 23220 et seq).

■ This proceeding was commenced by the district on October 31, 1949, in the Superior Court in and for the County of Tulare to have the contract confirmed. Confirmation is required by federal law (Omnibus Adjustment Act of 1926, § 46, 44 Stats. 649, 650, 43 U.S.C. § 423e (1946), Federal Reclamation Laws, Ann. 318-319), by section 42 of the contract and by the Water Code of the State of California (§ 22670 et seq., § 23225). It is a special proceeding in rem, and summons was by publication. It was brought against all persons having or claiming to have an interest in the formation of the plaintiff district and in the operation of the proposed contract and the lands affected thereby. It will fix the status of all property within the district lawfully affected by the contract and a final judgment will foreclose further inquiry into the matters to which the judgment properly relates. Within its pertinent issues it will be binding on the world at large. (Code Civ. Proc., § 1908; *Becher* v.

*Contoure Laboratories,* 279 U.S. 388 [49 S.Ct. 356, 73 L.Ed. 752] ; *Riley* v. *New York Trust Co.,* 315 U.S. 343 [62 S.Ct. 608, 86 L.Ed. 885] ; see *Frenchman-Cambridge Irr. Dist.* v. *Ferguson,* 154 Neb. 20 [46 N.W.2d 692].) The judgment is limited to a determination of the validity of the contract. As necessarily incident thereto questions relating to the title to and the control to be exercised over the unappropriated domestic waters of the state, to the distribution and sale of those waters by the district and to the ownership of the distributing system to be acquired by the district, will be considered.

Originally only two parties appeared as parties defendant, the first being the People of the State of California, acting by and through the attorney general. The other appearing defendant is Courtney McCracken, the owner of 309 acres of irrigable land within the district. He filed a demurrer on December 13, 1949, and an answer on November 11, 1950. He is a bachelor and those provisions of the contract (§§ 34, 35 and 36) which would limit to a single person the ownership of no more than 160 acres of land entitled to the distribution of water, particularly are sought to be applied to him. He is a nonresident of the district and could not, under terms of the applicable law (Wat. Code, § 23220 et seq.) vote for or against approval of the contract. He opposes confirmation for numerous reasons but particularly on the ground that the 160-acre limitation hereinafter considered is not applicable and is invalid as to him and his property within the district.

A default was entered against everyone not appearing within the time specified in the published notice of service. The United States did not formally appear but caused the Regional Counsel and Assistant Regional Counsel of the Bureau of Reclamation of the Department of the Interior to request permission to appear as amici curiae. Objection to such an appearance was interposed by the then attorney general on the ground that the United States was a party interested in the proceeding and should appear as such. The objection was overruled and the request granted. Federal counsel thus appeared and took part in the proceedings throughout the trial.

The State Engineer is Chief of the Division of Water Resources of the Department of Public Works and pursuant to law has exercised the duties imposed upon the Water Com-

608

mission.[1] ⬛ He did not appear prior to argument in the trial court, but at that time the court, on its own motion, set aside the default of the State Engineer and he appeared and filed an answer by his own counsel as he had the right to do. (Gov. Code, §§ 11040, 11041.) He stated that his interest in the proceeding was to protect the state water law from impairment, and that in the event the court saw fit to validate the contract he requested the court to confirm what he claimed to be established state law relating to the title of the state's water resources and regulations pertaining thereto. The particular relief which he seeks will be hereinafter noted.

Counsel for the Di Giorgio Fruit Corporation, the owner of large areas of irrigated and irrigable lands in the San Joaquin Valley in and out of the district, appeared as amici curiae and participated in the trial in opposition to confirmation of the contract.

The petition sets forth the essential facts as a basis for the request for confirmation. The prayer is that the court examine and enquire into the proceedings for the organization of the district and the validity of the contract, and that a judgment be entered confirming those proceedings and the contract. A copy of the proposed contract is attached to the petition and made a part thereof.

On December 13, 1949, the attorney general filed a general and special demurrer on behalf of the state in which he attacked the validity of the contract sought to be confirmed. Before the demurrer was ruled upon and on November 8, 1950, he filed an answer reiterating as defensive matter the position taken in the demurrer, which was (1) that the proposed contract would be an unconstitutional delegation of the legislative power of California to Congress, to the Secretary of the Interior, and to the district, acting jointly; (2) that certain land limitation provisions of the Reclamation Laws which the contract purports to apply within the district are not applicable to the land within the district; (3) that the contract unconstitutionally deprives owners of excess land of property without due process of law; (4) that the Irrigation District Federal Cooperation Law of the State of California, under which the district purports to proceed, violates the Constitution and laws of the State of California

[1]Under the provisions of A.B. 4, ch. 52, 1956 First Extra Sess., effective July 5, 1956, these duties, with the exception of supervision of water distribution, were transferred to the new State Water Rights Board, and the new Director of the Department of Water Resources assumed the functions of the Water Resources Board.

requiring uniform operation of general laws and prohibiting special laws where general laws may be applicable, and (5) that the contract is not authorized by federal law.

The prayer of the state was that a judgment be entered that the plaintiff take nothing by the petition; that a declaration be made of the rights and duties among themselves of the State of California, the United States, the plaintiff District and the landowners therein with respect to the contract, and for all other proper relief.

On March 7, 1951, in open court, the attorney general sought leave to withdraw the original answer of the State of California and to file an amended answer. Permission was granted and the amended answer was filed on March 30, 1951, seeking the confirmation of the contract.

The filing of the amended answer occurred after conferences and correspondence between the state's representatives and the Secretary of the Interior. In his letter of March 5, 1951, the Secretary of the Interior stated that questions "with respect to the historical, present and future ownership of water or water rights" would seem "to be immaterial to the question whether a particular contract for water service or for the construction of a distribution system, or both, is a valid one and to the question of the authority of the district to enter into it"; that he did not believe "that a finding that the contractual obligations are valid is determinative of the title of the water", and that the question "whether an individual water user, or a district may have a legal right to demand the continual delivery of project water after the expiration of the 40 year term of a water service clearly is not affected by a finding that the contract of itself is binding during its own express term."

In response to the letter of March 5, 1951, the attorney general replied, under date of March 22, 1951, that "It is my view that this contract is not intended to and does not deal with, determine, or settle any questions with respect to the historical, present or future claims of ownership of water or water rights that are now or may hereafter be urged by the United States, the State of California, the Ivanhoe Irrigation District, or individual or corporate landowners or users of the water, the furnishing of which is provided for by the said contract."

To the letter of March 22, 1951, the Secretary of the Interior replied under date of March 27, 1951, in which he agreed with the attorney general that the ownership of water

or water rights would not be affected by the contract or by the validation proceedings. He concluded that it would follow that water will be supplied pursuant to appropriations filed by the United States, appropriations filed by the state and assigned to the United States, and rights acquired by contract and otherwise from private individuals and corporations; that as to such water, the United States will contract only to furnish a supply and to be paid for services rendered; that the contracts will not and will not purport to affect the ownership of the water or rights thereto, and that the ownership of water or water rights by a water district or a landowner therein will be no different than had the supply been furnished by the Water Project Authority of the state.

Notwithstanding the foregoing the allegations of paragraphs VI and VIII of the original answer on behalf of the state and the same numbered paragraphs of the amended answer in effect remained the same. Paragraph VI of the amended answer alleges that the State of California, acting through its Department of Finance, pursuant to state law, previously filed with the Division of Water Resources of the Department of Public Works of California certain applications for the appropriation of the unappropriated waters of the Sacramento and San Joaquin Rivers and their tributaries for the use and benefit of the Central Valley Project and the owners of lands to be irrigated therefrom; that by assignments, made pursuant to statute, the State of California, again acting through its Department of Finance, assigned to the United States for the use and benefit of the Central Valley Project certain of those applications.

Paragraph VIII of the state's amended answer alleges that by virtue of the terms of the applications, the state has become and is the trustor of an express trust; that by the assignments the United States has become and is the trustee of that trust; that the landowners to be served from the works of the Central Valley Project, including the landowners of plaintiff district, have become and are the beneficiaries of that trust; that any and all claims or interests of the United States obtained by the proposed contract are held by the United States as such trustee as a part of a trust corpus or res for the use and benefit of the Central Valley Project and the landowners to be served water from the works of that project, and in particular the landowners of plaintiff District; that the State of California is entitled to be heard, among other things, as to all matters relating to the ad-

ministration and execution of the trust by the United States and is entitled to require that the trustee administer the trust according to its true intent and meaning.

However in apparent furtherance of the understanding between the attorney general and the Secretary of the Interior it was alleged in paragraph XI of the amended answer that the validity of the contract "does not depend on whether the United States has rights to the water to be delivered by it pursuant to the contract or rights to the use thereof or title or ownership thereto; . . . that an adjudication of such rights to water or the use thereof or title or ownership thereto is not appropriate in this proceeding, and that such an adjudication herein would be contrary to the best interests of the State and of the United States." Copies of correspondence between the Secretary of the Interior and the attorney general, including the letters above referred to, were attached as exhibits to the amended answer.

The prayer of the amended answer is "(1) that the district's legal capacity and authority to enter into the contract, the proceedings on the part of the district for the authorization of the execution of the contract, and the execution of the contract between the Ivanhoe Irrigation District and the United States be confirmed and declared valid; and (2) that the decree in this proceeding recite that on the issues properly raised in this proceeding the decree is not required to and does not purport to be an adjudication of the right or interest of the State of California or of its agencies, including but not limited to the Ivanhoe Irrigation District and the Water Project Authority, or of the right or interest of the United States or its agencies, or all or any of the above, in or to the waters or water rights or respecting the regulation of the use thereof under the laws of the State of California, involved in the Central Valley Project.

"AND WHEREFORE, the Water Project Authority which is not taking any position on the validity of the contract between the Ivanhoe Irrigation District and the United States, prays that the decree in this proceeding recite that on the issues properly raised in this proceeding the decree is not required to and does not purport to be an adjudication of the right or interest of the State of California or of its agencies including but not limited to the Ivanhoe Irrigation District and the Water Project Authority, or of the right or interest of the United States or its agencies, or any or all of the above, in or to the waters or water rights or respecting the regulation

of the use thereof under the laws of the State of California, involved in the Central Valley Project.''

On the day set for hearing, March 7, 1951, the court suggested that the district might be infringing upon the powers of the Water Project Authority of the State of California, and that the Authority might well be an active, indispensable party to the proceedings. Accordingly, the court set aside the default of the Authority and permitted it to file an answer. The Authority appeared through the attorney general, whose joint answer served as the amended answer for the State of California, heretofore set out in part, and the answer of the Authority. The latter assumed a neutral attitude so far as the validity of the contract was concerned, and prayed that a decree issue declaring the rights of the parties but not purporting to adjudicate the right or interest in or to water or water rights or respecting the regulation or use thereof under the laws of the state. The principal attorney for the Division of Water Resources of the Department of Public Works appeared as amicus curiae on behalf of the Water Project Authority.

The trial of the case insofar as the taking of evidence was concerned took place on April 3, 1951. The record consists of documentary evidence and other matters of which the court may take judicial notice. There are no disputed questions of fact. Briefing in the trial court was extensive and oral argument was not presented until more than a year later. The findings of fact and conclusions of law were signed and judgment was entered on February 27, 1953, denying confirmation of the contract on numerous grounds. ■ Under the statute if the contract fails of confirmation on one material ground it must fail of confirmation as a whole. (See Wat. Code, § 22680.) However, as the trial court refused confirmation on many grounds, more than one must be ruled upon for the guidance of the trial court in possible further proceedings. ■ The judgment contained injunctive orders prohibiting the district from refusing or failing to supply to the defendant Courtney McCracken water for irrigating purposes for all of his lands within the district and in general from proceeding under the contract. Since the judgment declaring the invalidity of the contract must be affirmed, the injunctive provisions may be disregarded. Neither those provisions nor anything herein should be taken as prohibiting the contracting parties from renegotiating a new contract or from continuing the distribution of water pending such negotiations.

Notices of appeal were filed on March 16, 1953, by the plaintiff Ivanhoe Irrigation District, and on March 17 by the People of the State of California and the Water Project Authority of the State of California. The district and the state have filed joint briefs. Reply briefs have been filed by the defendant Courtney McCracken supporting the judgment and the defendant State Engineer who seeks a judicial declaration of the nature of appropriative water rights under the state law, the legal status of the state in relation to water subject to appropriation, the status of the United States as trustee for the benefit of the project water users, and the interpretation of certain provisions of the federal Reclamation Project Acts of 1902 and 1939 hereinafter referred to. Amici curiae briefs in support of the judgment have been filed by the California Farm Bureau Federation and the Di Giorgio Fruit Corporation. An amicus curiae brief has been filed by the Ventura County Flood Control District, which does not attack the judgment as to the invalidity of the contract but contends that the court's conclusion of law to the effect that the water rights involved are appurtenant to the lands upon which the water is now used or is to be used, is not in accordance with existing law. The federal government is not a party to the appeal but it is apparent that its attitude is reflected in the position of the attorney general, particularly with reference to the 160-acre limitation hereafter discussed. There is no disagreement on the part of any party appearing as to the correctness of the judgment of the trial court that the title to and control over the unappropriated domestic waters of the state are vested in the state in trust for the water users of the state.

The questions raised in this case cannot be answered without reference to the nature and character of the title to the water rights involved. Closely related thereto and in part determinative thereof are the efforts put forth by the state in aid of the development of its water resources for the benefit of the people of the state, which efforts finally resulted in part in the Central Valley Project. From the beginning it was realized that the growth and development of the state, from the standpoint of agriculture, industry, population and general welfare, required sources of water supply in addition to the annual rainfall and underground supplies. This was especially true in the vast arid or semi-arid sections of the

state, including the great central valleys of the Sacramento and San Joaquin Rivers.

Authorization to inquire into the problem was provided for as early as 1850. (Stats. 1850, p. 256.) These efforts were repeated in 1878 (Stats. 1878, p. 634), in 1911 (Stats. 1911, p. 822), in 1913 by the adoption of the Water Commission Act (Stats. 1913, p. 1012), and in 1915 (Stats. 1915, p. 514). In 1921 a state-wide conservation plan study was authorized (Stats. 1921, p. 1685) and reports thereon were made to the Legislature in 1923 in Public Works Bulletins Numbers 4, 5 and 6. In 1923 the Legislature failed to furnish funds for further studies and money was provided by the Chambers of Commerce of Los Angeles and San Francisco for that purpose. A further report was made in 1925 in Public Works Bulletin Number 9. This report emphasized the needed coordinated development in the Sacramento and San Joaquin Valleys. In 1925 the Legislature provided for further studies and reports (Stats. 1925, p. 1013) which were made to the Legislature in 1927 by Public Works Bulletins Numbers 12, 13, 14, 15 and 16. These reports also emphasized the needed coordinated development in the Sacramento and San Joaquin valleys. Following these reports the Legislature in 1927 (Stats. 1927, p. 508) deemed it advisable to provide for the appropriation within the provisions of the then Water Commission Act of all of the unappropriated waters of the various streams of the state which might be needed for the coordinated plan of conservation in the central valleys. It was under this authorization that the Director of Finance, beginning in 1927, filed some 37 applications on behalf of the state on streams within the central valley area, some of which were intended for the storage of water in the Friant Reservoir of the San Joaquin River and the construction of the proposed main canal southerly therefrom through the area of plaintiff district. Several of these filings cover water which is essential to the Central Valley Project.

As the result of the prolonged studies and planning by the state, the Legislature in 1933 enacted a statute designating the Sacramento-San Joaquin coordinated project as the Central Valley Project, and created the Water Project Authority as an agency of the state to construct, operate and cover the cost of the project, estimated at $170,000,000. (Stats. 1933, p. 2643.) The units and works to constitute the Project were defined in the statute. They included, among other works, Friant Dam and the Friant-Kern Canal to conduct

water to and through the Ivanhoe area. That act is now contained in sections 11100-11830 of the Water Code.[2]

The Central Valley Project Act authorized the issuance and sale of $170,000,000 in revenue bonds. But in those days of depression and unemployment, such bonds were of doubtful or uncertain financial favor so far as the investing public was concerned. At any rate they were not sold and the state turned to the federal government for financial assistance. The problem then confronting the state was simply one of *money*. It is an undeniable fact that the State of California, without federal or other outside assistance, could have followed through with its plans for the development of the Central Valley Project if it had had the money with which to do it. The state was well equipped with an engineering staff and other expert assistance in its Department of Public Works, Division of Water Resources, to construct and operate necessary works and facilities to do all that has been done by the United States. All that was needed was the money available through state channels and expendable under the authority of the state alone. The Legislature contemplated and required that the Water Project Authority "proceed with the construction of the project immediately upon funds being available therefor" (Wat. Code, § 11452) and that the Authority have "full charge and control of the construction, operation, and maintenance of the Project and the collection of all rates, charges and revenues from it" (Wat. Code, § 11451).

The studies of California water problems by the Board of Public Works through the State Engineer pursuant to legislative authority beginning in 1921 and extending over a ten-year period at state expense were far-reaching. They have been characterized as "the most comprehensive and thoroughgoing set of studies instituted by a state agency looking to the development of its natural resources." (History of Legislation and Policy Formation of the Central Valley Project, U. S. Dept. of Agriculture, Bureau of Agricultural Economics [1946].) The report based on these studies (Public Works Bulletin 25, Report to Legislature of 1931 on State Water Plan) was officially approved by the Legislature

---

[2]An overall state water plan, entitled "The California Water Plan," was undertaken by the Director of Water Resources and a preliminary report was issued entitled "Report on the California Water Plan, Preliminary Edition," State Water Resources Board, Bull. No. 3, May, 1956."

in 1941. (Stats. 1941, p. 2943, Wat. Code, § 10001.) Admittedly the Central Valley Project is not the result of the planning, ingenuity and energy of the Bureau of Reclamation, but it is recognized by the Bureau and the Department of Interior to be the creature of the state. This is shown by the testimony of the Commissioner of Reclamation in relation to the Department's 1948 Appropriation Bill as follows: "The history [of the Central Valley Project] is also necessary to understand this project. This project has been a dream of over half a century in California. The Bureau of Reclamation did not start this project. It has been made the agent for completing it." (Hearings before the Subcommittee of the Committee on Appropriations, House of Representatives, Eightieth Congress, First Session on the Interior Department Appropriation Bill for 1948, p. 723.)

Faced with lack of state funds sufficient to finance such an extensive enterprise application was made to the United States for loans or grants of federal funds sufficient to construct the initial units of the project. The loans sought were to be secured by the revenue bonds of the Project Authority authorized by the Central Valley Project Act. Although the engineering feasibility and the need for the project were recognized by the Financial Division of the Public Works Administration, and several other federal agencies reported favorably on the project, the economic soundness of the project was questioned and efforts along these lines were terminated. However, in 1935 the project was referred to the Bureau of Reclamation of the Department of the Interior for study. In the report of the Secretary of the Interior to the President on the 26th of November, 1935 (Booklet of Information for Conferences Between U .S. Dept. of the Interior and Water Project Authority of the State of California [Aug. 28,1940], p. 16), on the feasibility of the project it is stated: "The next declaration required is that the cost of construction will probably be returned to the Federal Government. This is interpreted to mean that it will be returned within forty years from the time the Secretary issues public notice that water is available from the Project works. The estimated cost of construction is $170,000,000.00 and the annual cost, including repayment of all other charges, is $7,500,000.00. It is estimated that the annual revenues from the sale of water and of electric power will be sufficient to cover these charges. The favorable conditions heretofore recited justify the belief that the project

will return its cost.'' Relying on this report the President gave his approval to the proposed plan as a federal reclamation project. (Booklet of Information, *supra,* p. 15.) The President, on recommendation of the Secretary of the Interior, allocated $20,000,000, later reduced to $4,200,000 under the Emergency Relief Appropriation Act of 1935, to initiate construction of the project. In that same year, with the passage of the Rivers and Harbors Act on August 30, 1935, a direct contribution of $12,000,000 from federal funds was authorized for the construction of Kennett (now Shasta) Dam. (U. S. Stats., 49 Stats., p. 1038.) Thereafter Congress regularly made funds available to the Bureau of Reclamation for the construction of the project, and prior to August 31, 1951, a total of $396,937,427 had been appropriated. The Bureau of Reclamation established an office in Sacramento and commenced work on the project in 1935. Work on the project units including the plaintiff district's unit has been continuously prosecuted. It is to be noted that the allocations of funds by the federal government were generally made with a proviso that such funds were reimbursable in accordance with the reclamation laws. (See First Deficiency Appropriation Act of 1936, June 22, 1936; Booklet of Information, *supra,* pp. 23, 24, 25, 30, 31.)

There can be no question but that the Federal Bureau of Reclamation and not the Water Project Authority of the state has constructed those units of the Central Valley Project heretofore completed. But it appears from the foregoing and the following that the parties contemplated a state project to be eventually owned and operated by the state. The Water Project Authority, at the request of the bureau, was in close cooperation with the bureau throughout. On March 25, 1936, a cooperative contract was executed between the United States and the Water Project Authority. This was followed by four additional supplemental contracts on March 13, 1937, November 8, 1937, January 17, 1939, and June 30, 1939. These contracts and others executed by the state's Department of Public Works provided, among other things, for the performance of certain tasks by the state agencies and approval of the Bureau's planning by the Authority. The first cooperative contract with the Authority contained a special provision as follows: ''It is contemplated that at the earliest practicable date a contract will be entered into between the United States and the Water Project Authority, providing for, but not limited to: (a) The operation

and maintenance by the authority of useful units of the project, upon presenting assurance of payment satisfactory to the United States of the cost thereof. (b) Appropriate payment by the authority to the United States for expenditures in construction of the project.'' In the second and third supplemental contracts the special provision was restated in about the same terms. On February 15, 1939, the governor of the state addressed a letter to the Secretary of the Interior in which he suggested that a contract be entered into immediately providing for the administration, operation and maintenance of the project by the Authority, and for the repayment of the reimbursable costs of the project by the Authority to the United States. In answer thereto the Secretary of the Interior suggested procedures by which state agencies might take over certain facilities. No definite developments resulted along this line.

The United States has acquired in its own name rights to certain domestic waters of the state. These rights are to waters which are essential to the success of the Central Valley Project. No claim is made that such water has been acquired for any purpose other than for the use and benefit of the project. The nature of the interest or title which the United States has acquired is hereinafter referred to. The United States owns no lands in the Central Valley, and by express provision the acquisition of water rights in most instances was for the benefit of the Central Valley Project or units thereof. The greater portion of water to which the United States has acquired rights is by assignments from the state's Director of Finance. (Wat. Code, § 10500 through 10506.) Four assignments of applications for the appropriation of unappropriated water of the Sacramento River, totaling 35,000 second-feet diversion and 12,690,000 acre-feet annual storage, were made on September 3, 1938. On September 30, 1939, three assignments of applications for the appropriation of unappropriated water of the San Joaquin River, totaling 9,500 second-feet diversion and 4,420,000 acre-feet annual storage, were made to the United States. Requests for additional assignments have been made to the Director of Finance by the United States. The assignments made were in trust for the use and benefit of the Central Valley Project and with the necessary reservation that the landowners and inhabitants within a watershed area or other area conveniently supplied by the watershed area are not to be deprived of their prior rights to water reasonably required for their

beneficial needs. (Wat. Code, §§ 11460 and 11463; see Wat. Code, § 11128, as added in 1951 [Stats. 1951, p. 3216].)

The United States itself, between 1943 and 1952, as original applicant, filed eight applications for the appropriation of unappropriated water totaling 33,810 second-feet diversion and 2,646,000 acre-feet annual storage of domestic waters of the state. In all instances these applications were made for specific purposes in connection with the Central Valley Project.

The United States has also acquired through contract extensive riparian, appropriative and prescriptive water rights in the San Joaquin River once held by Miller and Lux, Inc. Water rights in the area involved have been the subject of considerable litigation. (See *United States* v. *Gerlach Live Stock Co.*, 339 U.S. 725 [70 S.Ct. 955, 94 L.Ed. 1231]; *Everett G. Rank* v. *Krug* (*U.S.Dist.Ct., Southern Dist. of California, Northern Div. No. 685-N.D.*), 142 F.Supp. 1; *Hollister Land & Cattle Co.* v. *Krug* (*U.S.Dist.Court, Southern District of California, Northern Division, No. 680-N.D.*), [*Rank* v. *Krug*, 90 F.Supp. 773, 806].) It is asserted that the United States intends to divert some of this water to the Central Valley Project. By agreement dated May 24, 1939, between the United States and the Madera Irrigation District, the United States acquired assignments of all of the District's applications to appropriate the water of the San Joaquin River, grants of the Friant Dam site, portions of the reservoir area and certain gravel deposits. In addition to the foregoing, the United States has acquired, or is in the process of acquiring, the riparian, appropriative and prescriptive water rights of hundreds of smaller landowners, all of whom are affected by the construction of units and the diversion of water for the Central Valley Project.

In view of the foregoing circumstances the trial court properly refused to eliminate the issue of title from the case. It is obvious that the attorney general of the state and the Secretary of the Interior could not, by agreement, exclude from the proceeding the question of title or ownership of water or foreclose other interested parties from pressing it as a vital question in the case. There is no dispute between any of the parties appearing in the litigation as to the nature of that title and it is of great importance for upon it depends the extent to which the state or the United States or any party dealing with the domestic waters of the state may exercise powers of control.

If the United States, or the State of California or any of its agencies, should be declared to be the owner of the title to the water without restriction it would necessarily follow that it would have complete dominion and control over such property for purposes of distribution or for any other incident of ownership and use. In such case the principles of law applying to unrestricted ownership would control. On the other hand, if the United States or the State of California or its agencies, in dealing with the storage, sale, distribution and use of such water, is acting as trustee for the beneficiaries of the trust, other principles of law, namely the law of trusts, would necessarily apply. The exclusion of the question of title from the case could be justified only on the theory that without question, and as a matter of law, the fee simple unrestricted title to the water is in the state or in its assignee, the United States, or in the United States other than by assignment unaffected by the claims of the land owners in the District as the beneficiaries of a trust. Such a theory finds no support in the present case.

A trust relationship has existed at all times here involved, and now exists, between the State of California and the water users of the state, including the water users of the plaintiff district, as to all waters the control of which has been acquired by the state by appropriation or purchase. As stated it is asserted by appropriate allegations in the pleadings of all of the parties formally appearing as parties defendant, including the State of California, and the existence of such a trust relationship is not denied by the plaintiff district or by any party appearing in the proceeding. It is only because of the position alleged to be asserted by the United States that it is vested with absolute ownership in and to the water to be distributed to the lands in the district, and to the property of the district used and usable in the distribution of water to lands therein, that the question of title has arisen. The question is also important as bearing on the contention of the landowners in the district that the contract would deprive them of vested rights without due process of law and without just or any compensation.

In considering the question of the title of the United States and of the State of California in and to the domestic water of the state and the corresponding limited measure of control which they may exercise over them, it is well to consider certain historical phases of the water law of this state. And this may be better understood by considering the attitude

assumed by some of the water users of the state in their contentions for many years that they had absolute and unrestricted title and dominion over the waters riparian to their lands to the exclusion of the rights of the state in administering the trust imposed upon it by the water law of the state for the benefit of other water users.

In the early history of California the waters of the rivers and streams of the state, especially in the northern section, were used for placer and hydraulic mining, the raising of livestock, domestic and kindred purposes. It was early realized that water in this semiarid region was of utmost importance to the welfare, progress and prosperity of the people of the state. There were few court decisions on the subject having a statewide significance prior to the case of *Lux* v. *Haggin* in 1886 (69 Cal. 255, 454 [4 P. 919, 10 P. 674]). At that time section 4468 of the Political Code provided as follows: ''The common law of England, so far as it is not repugnant to or inconsistent with the constitution of the United States, or the constitution or laws of the state of California, shall be the rule of decision in all the courts of this state.'' This court took the general language of that declaration by its four corners and applied the English common-law doctrine of riparian rights to the ownership, control and use of the waters of the rivers and streams of the state. The doctrine was declared to be that the owner of real property bordering such a river or stream had a right coexistent with the same rights of other landowners on the stream, to the use of its waters and the flow thereof as it was ''wont to do in the course of nature'' unimpaired in quality and undiminished in quantity. This right was declared by this court in *Lux* v. *Haggin, supra,* 69 Cal. 255, to be a right appurtenant to the land, in fact a part and parcel of the land itself. ■ Under this doctrine the riparian owner had the right to insist that the full flow of the stream continue to pass by his land in its natural state whether he needed the water or not. This riparian right as so defined was declared by this court to be a property right which vested in the riparian owner and as such was protected by the state and federal Constitutions. It could not be limited or impaired without due process of law and without just compensation. The enforcement of that right as so defined led to the adoption of the Water Commission Act of 1913. (Stats. 1913, p. 1012.)

By the provisions of that act it was sought, among other objectives, to subject the enjoyment of the riparian right to

the rule of reasonable beneficial use. Accordingly it was provided in that act that the use of the waters of the rivers and streams of the state on the part of the riparian owners be limited to the water they could reasonably use for beneficial purposes and that whatever water remained in the stream flow would be subject to reasonable use through appropriation or other methods provided by law. The substance of what the Legislature was endeavoring to do was to provide, in the exercise of its police power, that the riparian owner could continue to have the right to the benefit and enjoyment of the waters of the stream both in the present and in the future insofar as he was able to put it to beneficial use on his own land but that beyond that he could not insist that the water flow by and beyond his land whether he needed it or not. Nevertheless this court adhered to the doctrine of *Lux* v. *Haggin* and by judicial interpretation made ineffective those provisions of the Water Commission Act of 1913 designed to restrict riparian rights to reasonable beneficial use. In *Herminghaus* v. *Southern Calif. Edison Co.* (1926), 200 Cal. 81 [252 P. 607], the court reannounced its adherence to the ancient doctrine and held in effect that no matter how unreasonable the claim of a riparian owner to the full flow of a stream might be he had the right to assert it.

Following that decision the Legislature sought to implant in the Constitution of the state, and there was subsequently incorporated in that document, the provisions of section 3 of article XIV, which again declared the policy of the state "that the general welfare of the state requires that the water resources of the state be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. . . . Riparian rights in a stream or water course attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses; provided, however, that nothing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which his land is riparian under reasonable methods of diversion and use, or of depriving any appropriator of water to which he is lawfully entitled."

The foregoing amendment to the Constitution as proposed by the Legislature in 1927 and adopted in November 1928 focused the attention of the courts upon the persistent endeavor of the people of the state, first through the Legislature in 1913 by the adoption of the Water Commission Act in that year and then by the constitutional amendment in 1928, to put into effect the doctrine of reasonable beneficial use. The obvious purpose of the new constitutional provision was to invite and urge a judicial declaration that the vested right of the riparian owner be subjected to that doctrine. Thereafter this court so declared. (*Gin Chow* v. *Santa Barbara* (1933), 217 Cal. 673 [22 P.2d 5]; *Peabody* v. *City of Vallejo* (1935), 2 Cal.2d 351 [40 P.2d 486].) ▮ Within the scope of reasonable beneficial use, vested rights of the riparian owner continued to attach to his land as a part and parcel of the land itself, and as such was necessarily protected from unlawful encroachment by both state and federal Constitutions. The result is that this vested right as now defined may not be destroyed or infringed upon without due process of law or without just compensation under either Constitution.

▮ No encroachment on the vested rights of riparian owners is directly involved in this proceeding, but the foregoing observations are pertinent as bearing upon the rights of the people of the state, both present and prospective, to avail themselves by appropriation or other lawful means of the right to the use of waters to which a prior lawful use has not attached. In this category the waters here sought to be furnished to and used by the landowners in the district must be classified. We are therefore here directly concerned with the title, distribution and use of water which has not heretofore been subjected to beneficial use except as contemplated by acquisition, by appropriation or otherwise on the part of the State of California and the United States.

It is thus apparent that the more recent changes in the constitutional and decisional law of this state had the effect of making available for beneficial uses by appropriation and other means great volumes of unappropriated domestic waters of the state. The nature of the title to the waters here involved is further indicated by the statutory law of this state. The title to these waters was mentioned at an early date in the amendment of section 1410 of the Civil Code in 1911 which provided that "All water or the use of water within the State of California is the property of the people of the State of California" subject to appropriation and use in the

manner prescribed by law. That provisions in effect was carried into section 11 of the Water Commission Act of 1913 which provided that ''All waters flowing in any natural water course in the state excepting so far as such waters have been or are being applied to useful or beneficial purposes, upon, or in so far as such waters are or may be reasonably needed for useful, and beneficial purposes upon lands riparian thereto, or otherwise appropriated, is and are hereby declared to be public waters of the state. of California and subject to appropriation in accordance with the provisions of this act.'' (Stats. 1913, p. 1018.) The same provision was carried into the Water Code in 1943 as section 102.

Section 104 of that code provides: ''It is hereby declared that the people of the state have a paramount interest in the use of the water of the State and that the State shall determine what water of the State, surface and underground, can be converted to public use or controlled for public protection.'' Section 105 of the same code provides that ''It is hereby declared that the protection of the public interest in the development of the water resources of the State is of vital concern to the people of the State and that the State shall determine in what way the waters of the state, both surface and underground, should be developed for the greatest public benefit.'' Section 1052 of that code provides that the diversion or use of water other than as authorized by the code is a trespass and the Department of Public Works, acting through the State Engineer, may initiate actions in the superior court to have the trespass enjoined.

It has long been the established law of the state that an irrigation district is trustee for the landowners within the district and limited in its trust to receive and distribute water to them. (*Merchants Nat. Bank* v. *Escondido Irr. Dist.*, 144 Cal. 329 [77 P. 937] ; *Tulare Irr. Dist.* v. *Collins*, 154 Cal. 440, 442 [97 P. 1124].) In the Merchants Bank case the court stated: ''But here, the corporation in question is distinguished from ordinary municipal corporations by the fact that 'the legal title,' only of the property of the corporation is vested in the district, 'in trust for the uses and purposes set forth in (the) act'; and that the beneficiaries of the trust— who, upon familiar equitable principles, are to be regarded as the owners of the property—are the landowners in the district with whose funds the property has been acquired (Civ. Code, § 853) ; and in whom, indeed, is vested by the express provisions of the statute, in each, the right to the

several use of a definite proportion of the water of the district, and in all, in common, the equitable ownership of its water-rights, reservoirs, ditches, and property generally, as the means of supplying water. (Stats. 1887, pp. 34, 35 §§ 11, 13.) Such rights as these cannot be distinguished in any way from other private rights, and therefore clearly come within the protection of the provision of section 13 of article I of the state Constitution . . . that 'no person shall be . . . deprived of . . . property without due process of law,' and of the similar provision of Section 1 of the fourteenth amendment to the constitution of the United States.'' (See also *Allen* v. *Hussey*, 101 Cal.App.2d 457, 472 [255 P.2d 674]; *Bottoms* v. *Madera Irr. Dist.*, 74 Cal.App. 681, 702 [242 P. 100]; *Colburn* v. *Wilson*, 23 Idaho 337.)

▮ Likewise the state is not the owner of the domestic water of the state in the sense that it has absolute power and dominion over it to the exclusion of the rights of those who have the beneficial interest therein. The title is an equitable one residing in the water users of the state. The state as an entity is the holder of the legal title as trustee for the benefit of the people of the state, all of whom in the last analysis, are the water users of the state. (See *Hall* v. *Superior Court*, 198 Cal. 373, 383 [245 P. 814]: *Tulare Irr. Dist.* v. *Collins*, 154 Cal. 440, 442 [97 P. 1124]; *Merchants Nat. Bank* v. *Escondido Irr. Dist, supra*, 144 Cal. 329.) ▮ To avail themselves of the right thereto, individually, collectively or in a corporate capacity, administrative procedures have been established and are set forth in the Water Code and related statutory provisions. Compliance with those provisions is necessary in order that the right to use the water may be acquired, but always consistent with the trust relationship incident thereto. ▮ Occupying such a relationship it would be incompetent for the state to divest itself of the legal title, by grant, assignment or otherwise, in any way inconsistent with the rights of the beneficiaries. It would necessarily follow that it would be inconsistent with the trust for the state to attempt to pass the legal title freed from the trust to any third party, including the United States. ▮ As trustee the state and its agencies, of which the plaintiff district is one, are bound faithfully to administer that trust and are answerable to the courts, in the exercise of their traditional powers in equity, for the proper discharge of their stewardship. They must administer it consistently with and not in violation of the rights of the beneficiaries. (*Merchants Nat.*

*Bank* v. *Escondido Irr. Dist., supra,* 144 Cal. 329; *Lindsay-Strathmore Irr. Dist.* v. *Wutchumna Water Co.,* 111 Cal.App. 688, 698 [296 P. 933]; *Allen* v. *Hussey,* 101 Cal.App.2d 457, 467 [225 P.2d 674].) But it is not to say that the state may not in the administration of the trust prescribe or provide for reasonable terms and conditions to which the beneficiaries must conform in order to have the benefit of expenditures made necessary in providing those benefits. These may be provided for by statute or, as here, by contracts when duly authorized by law.

The trust relationship existing between the state and the beneficiaries of the trust must therefore be kept in mind in connection with any transactions between the state or any of its agencies and outside parties. It follows that when an outside party, such as the United States, by contract, legislation or otherwise, steps into the shoes of the state to administer that trust by the development, conservation and distribution of the trust res, it is bound by the same rules of law as surround and govern the State of California or any other purveyor of water of the state for the benefit of its water users. The state may not therefore lawfully dispossess itself of the title to such water and may not surrender its control of the same in any way inconsistent with the administration of the trust under which the title is held. The state by general law may and has in the main prescribed the terms and conditions under which the several classes of water users may become secure in their right to the water and use thereof. The water users of the state whose rights have not become vested within the classes above mentioned but who are dependent upon an adequate supply of fresh water for their existence in the manifold uses to which it may be supplied, have an inchoate right to such uses subject to like enforcement and equal protection of the law. This right is necessarily dependent upon compliance with reasonable rules and regulations attending it and to the circumstances of each case such as an adequate water supply, the ability of the supplier to furnish the water, reasonable payment for the service and perhaps other conditions not necessary to mention in the conservation and distribution of a water supply in our complex civilization. This inchoate right of present and potential water users of the state is a right of which cognizance must be taken in dealing with the general subject of the water law of the state and in particular with the rights of landowners and water users within the plaintiff district.

It is therefore concluded that the title to the unappropriated domestic waters of the state is in the State of California in trust for the use and benefit of the beneficiaries of that trust; that the trust character of that title is anchored in the state by constitutional provisions, by statutes enacted in furtherance thereof, and by the decisional law of the state; that the beneficiaries of that trust are the water users of the state who in a general sense constitute all of the people of the state; that the beneficiaries of the trust relationship whose rights are here under consideration are those present or prospective users who individually or in properly classified groups bring themselves within the orbit of the state law under which they may be in position to demand benefits without discrimination, and that within that category are the landowners of the district. It is they who are in position to avail themselves of the right to beneficial use of the waters to be purveyed and to demand indiscriminate service. There is nothing in the foregoing declaration which interjects anything new into the water law of the state. It is but a recognition and redeclaration of existing fundamental concepts of this phase of our law.

It is well to consider at this point the federal law relating to the nature of the water rights acquired by the United States and affecting the rights of the land owners of the district thereunder. The Reclamation Act of 1902 (32 Stats. 388, 43 U.S.C. § 391) is the basic federal enactment on that subject. Under that law and subsequent laws in aid thereof, the Bureau of Reclamation is assuming to administer water through the Central Valley Project. Section 8 of the Act of 1902 provides: ''That nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any state or territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder and the Secretary of the Interior, in carrying out the provisions of this Act shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any state or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or of waters thereof; provided, that the right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated and beneficial use shall be the basis, the measure, and the limit of the right.'' The meaning and intent of section 8 of the Reclamation Act as it specifically applies

to the waters involved in the Central Valley Project has been stated by the Supreme Court in *United States* v. *Gerlach Livestock, Co., supra,* 339 U.S. 725. At pages 734-735 the court said: "Congress proceeded on the basis of full recognition of water rights having valid existence under state law. By its command that the provisions of the reclamation law should govern the construction, operation and maintenance of the several construction projects, Congress directed the Secretary of Interior to proceed in conformity with state laws, giving full recognition to every right vested under these laws. *Cf. Nebraska* v. *Wyoming,* 295 U.S. 40, 43 [79 L.Ed. 1289, 1291, 55 S.Ct. 568]; *California Oregon Power Co.* v. *Beaver Portland Cement Co.,* 295 U.S. 142, 164 [79 L.Ed. 1356, 1364, 55 S.Ct. 725]; *Nebraska* v. *Wyoming,* 325 U.S. 589, 614 [89 L.Ed. 1815, 1829, 1830, 65 S.Ct. 1332]; *Silas Mason Co.* v. *Tax Com.,* 302 U.S. 186 [82 L.Ed. 187, 58 S.Ct. 233]. . . . We think it clear that throughout conception, enactment and subsequent administration of the plan, Congress has recognized the property status of water rights vested under California law. The governing water law of California is now derived from a 1928 amendment to its Constitution . . ." (Art. XIV, § 1) ". . . to which," as the Supreme Court in the Gerlach case said, "the Federal Reclamation Act defers." (See also *United States* v. *Rio Grande Dam & Irr. Co.,* 174 U.S. 690 [19 S.Ct. 770, 43 L.Ed. 1136]; *State of Connecticut* v. *Commonwealth of Massachusetts,* 282 U.S. 660 [51 S.Ct. 286, 75 L.Ed. 602].)

Thus the federal government both by legislation and court decision has recognized that the law of this state is determinative of rights to water in this state. This court also so held in *Peabody* v. *City of Vallejo,* 2 Cal.2d 351, at page 366 [40 P.2d 486].

We therefore feel free to declare that in all transactions between the United States and the State of California or its agencies such as the plaintiff district, the parties are dealing with trust property held by the state or by those who have acquired rights to it from the state or otherwise for the benefit of the real owners thereof. They are the present and prospective water users of the state who may become entitled thereto under the laws of the state. Whatever interest or title the United States has acquired to water by appropriation, assignment or by other means of acquisition in furtherance of the execution of its trust relationship with the water users of the state is necessarily subject to the limitations of title herein determined.

It is to be observed that we are not here dealing with all of the problems incident to the relationship of the state and its agencies and the federal government in the construction, maintenance, control and operation of the works for the distribution and use of the domestic waters of the state. We are not here concerned with the ownership and control of interstate waters or any other waters coming within well recognized federal control. (See *Federal Power Com.* v. *State of Oregon* (June, 1955), 349 U.S. 435 [75 S.Ct. 832, 99 L.Ed. 1215].) We are not concerned with problems attending the title, sale, distribution and use of water in the development of government owned land for there are no federally owned irrigable lands within the plaintiff district. Nor are we concerned with questions relating to the sale and distribution of water by a privately owned public utility, nor with the distribution and sale of electrical energy developed through or by means of storage facilities constructed by the State of California or by the United States or both. We are here concerned only with questions of the title, sale and distribution of intrastate or domestic waters and with the title to the distributing system and facilities acquired for the specific purpose of irrigating the lands within the plaintiff district.

We now turn to the provisions of the contract in controversy. Considered in connection with the legislation surrounding it, both federal and state, the contract is an instrument which, from the standpoint first of its fiscal provisions, provides in Part B for the construction by the United States of a distributing system within the district for a specified consideration payable to the United States in 40 equal annual installments; and in Part A to furnish to the district and by it to the owners of irrigable lands within the district a supplementary supply of domestic waters of the state developed through the construction and operation of the Central Valley Project at a price per acre foot payable annually. The concept of repayment to the United States for its costs is the unmistakable theme throughout the entire transaction.

In entering into the contract the parties are dealing within statutory authorization but at arm's length. It is not oversimplification to state that the relationship of the parties so far as construction work is concerned is that of debtor and creditor, for it is clear beyond question that they and the law under which they are operating contemplate that when the money expended by the United States has been repaid by the district or on its behalf, the district is entitled to an

acquittance and will thereby become the owner of the distribution system and all of the property used and useful in the maintenance and operation thereof free and clear of any claims of others, to the same extent as if the district had constructed the distributing system itself with its own funds and had thus become the owner in trust for the water users within the district. As stated it is certainly true that it was within the power of the district under the laws of this state to do in the first instance all that the United States is obligating itself to do under the contract with reference to the construction of a distributing system. The district was authorized to obtain funds for that purpose by borrowing from the United States with or without the issuance of irrigation district bonds (Wat. Code, §§ 23280-23289) and it could contract for the payment for water distributed to it by or through an outside source at a fixed point of delivery upon the payment of the charges agreed upon from funds of its own, if available. (Wat. Code, § 22228.) In essence, therefore, we have here one party agreeing to provide the funds for construction work and undertaking to furnish water at a definite delivery point, and the other party agreeing to accept the water at that point with payment therefor at a fixed rate and repayment of the construction charges in installments within 40 years, coupled with what appears to be all sufficient assurances of security in the event of nonpayment. Within the compass of those provisions there can be no doubt of the right and power of the parties to lawfully contract.

Included in the assurance of payment according to the contract are obligations on the part of the district to provide funds for repayment by taxation of the lands within the district, by assessments against the lands for that purpose and the fixation of water charges sufficient to provide the security required by the United States. It is the right of the United States to demand that assurances of security for repayment of monies advanced by it be included in the contract; and provisions to that effect are included therein. The contract goes further and provides that upon default in payments as they become due the United States shall have the right to take over the operation of the affairs of the district in order to assure timely and adequate repayment. Likewise, it is the right and duty of the district to have included in the contract provisions for adequate clearance of its obligations to repay, including the designation therein of the amount expended or to be expended by the United

States for the benefit of the district and its landowners, or to a workable provision therein as to how the amount advanced by the United States may be ascertained when the time for final accounting, repayment and acquittance arrives, together with the designation of a definite time when repayment is finally due. The present contract does not with certainty set forth such fiscal matters, particularly as it relates to repayment for the construction of the major storage facilities from which water will be delivered to the district. Upon repayment the district would succeed to whatever title to lands, structures or works acquired by the United States within the district in aid of its activities on behalf of the district and the landowners within the district, in like manner and to the same extent as an ordinary debtor is entitled to a satisfaction of record evidencing the payment of his indebtedness.[3] (See *Owl Creek Irr. Dist.* v. *Bryson*, 71 Wyo. 30, at pp. 69-70 [253 P.2d 867, 258 P.2d 220].)

Although the relationship of debtor and creditor is clearly established on the record, it is not clear in what way the district and its landowners may become free of indebtedness upon repayment. For example, it is provided in the contract that the United States may acquire property within the district in its own name for the purpose of constructing the distributing system, and that pursuant to an act of Congress authorizing such acquisition of property for the benefit of the landowners of the district, the United States may divest itself of ownership only in such manner as may be provided by Congress. Obviously such a provision in the agreement is contrary to the debtor-creditor relationship existing between the United States and the district. The right and obligation on the part of the United States would seem to be to hold the property thus acquired by it in its own name only until final repayment is made, with the right of the district to a conveyance thereof not dependent on a future and necessarily discretionary act of Congress.

However, it is mainly because the contract includes provisions not relating to its fiscal aspects that the defendant

---

[3] In an obvious attempt to correct the uncertainty in contracts entered into pursuant to existing reclamation law, recent legislation by Congress has defined in greater detail the allocation of payments for water service between operation, maintenance and construction costs of reclamation projects. (Pub. L. No. 643, 84th Cong., 2d Sess. § 1(3) (July 2, 1956), 70 U.S. Stat. 483-484 (1956).) Such legislation, of course, was not in effect at the time the present contract was entered into and the judgment herein entered.

landowner, the State Engineer representing the Division of Water Resources of the Department of Public Works and amici curiae are opposing it.

On behalf of the state, the attorney general first directs his attack upon that portion of the judgment which holds the 160-acre limitation of the contract void as applied to the state, to the district and to the owners of irrigable land within the district. The genesis of the 160-acre limitation is found in the original Reclamation Act of June 17, 1902, heretofore referred to. (32 Stats., p. 388.) That act is entitled "An act appropriating the receipts from the sale and disposal of public lands in certain States and Territories to the construction of irrigation works for reclamation of arid lands."

It is relatively a brief enactment. It occupies less than three pages of the Statutes at Large of the 57th Congress. Section 1 provides that all moneys received from the sale and disposal of public lands in western states should be set aside in a special fund known as the "reclamation fund." This fund is to be used in the examination and survey for and the construction and maintenance of "irrigation works, diversion, and development of water for the reclamation of arid and semi-arid lands in the said States and Territories." Subsequent sections provide that the Secretary of the Interior construct appropriate irrigation works; that he may withdraw certain public lands from entry, or restore other lands to public entry, as such lands are required for irrigation works; "that public lands which it is proposed to irrigate by means of any contemplated works shall be subject to entry only under the provisions of the homestead laws in tracts of not less than forty nor more than one hundred and sixty acres"; that the Secretary may limit the area per entry of such public lands to be irrigated; that he shall fix the charges "which shall be made per acre upon the said entries, and upon lands in private ownership which may be irrigated by the waters of the said irrigation project"; that no "right to the use of water for land in private ownership shall be sold for a tract exceeding one hundred and sixty acres to any one landowner, and no such sale shall be made to any landowner unless he be an actual bona fide resident of such land"; that the Secretary is authorized to use the reclamation fund to accomplish the purpose of the act; that when repayments required by the act "are made for the major portion of the lands irrigated from the waters of any of the works herein provided for, then the management and operation of such irrigation works shall pass

to the owners of the lands irrigated thereby'' except that ''the title to and the management and operation of the reservoirs and the works necessary for their protection and operation shall remain in the Government until otherwise provided by Congress,'' and that the Secretary may acquire, by judicial process or otherwise, the lands necessary to carry out the purpose of the act.

It is noted that the repayment period was originally 10 years as provided for in section 10 of the act. It was increased to 20 years by the Reclamation Act of 1914. (38 Stats. 686, 687.) It was changed by the Second Deficiency Act of 1924 to an indefinite period determined by the productive power of the land. (43 Stats. 702.) It was again changed in 1926 to 40 years by the Interior Department Appropriation Act of 1927. (44 Stats. 479.)

It is readily observed from the provisions of the Reclamation Act of 1902 that one of its main purposes was to provide for the reclamation of vast areas in the 17 western states and territories where title to the land was still in the federal government as owner, and the development of that land into private ownership was deemed essential to the general welfare in establishing homes and small farming enterprises in the great western domain.

As a part of this farsighted plan of the federal government it was undoubtedly recognized that the desired result could best be accomplished by limiting the amount of land thus to be purchased and developed. To justify such a limitation in the contract in question, the attorney general points to other federal enactments which it is claimed were designed for the same purpose and which are claimed to have had the same effect. Among these enactments are the Homestead Act of May 20, 1862 (12 Stats. 392) where it was provided that the amount of land to be acquired by any one person from the federal government should not exceed 160 acres. Again on May 10, 1872, the Mines and Mining Act provided for a limitation on a mining claim usually running lengthwise on the vein of ore. (17 Stats. 91.)

Another illustration of a limitation placed by the federal government on the sale of its publicly owned land is found in the Desert Land Act of March 3, 1877 (19 Stats. 377), where a limitation of 320 acres was placed on a purchase by one individual. One of the conditions of purchase of land under that act was that the entryman or purchaser provide for the water to reclaim the desert land. Another illustration

is the Timber and Stone Act of June 3, 1878, where a limitation for purchase by an individual was placed at 160 acres (20 Stats. 89).

Further research would probably disclose other illustrations, but sufficient have been noted to demonstrate that the federal government in all of such instances has exercised its power as the owner of the land to be offered for sale. No limitation on its power to sell and convey its own lands existed or could properly be asserted. The United States was the owner of the fee with all of the rights of proprietorship. It could sell or refuse to sell as it pleased. It could and often did withdraw such lands from entry or sale. As proprietor it could part with its lands under such terms and conditions of sale as it saw fit, including a limitation on acreage, price, term of payment, and otherwise. However, in its activities as the owner and grantor it controlled the limitation only as to the first purchasers. It is common knowledge that after the title passed to the buyer, the land then was subject to resale to grantees either private or corporate within the ordinary channels of purchase and sale in the field of private property acquisition and ownership. The buyer was then in position to sell to whom he pleased, or accumulate properties similarly purchased by others so that his total acreage might far exceed the original statutory acreage limitation.

We attribute no merit to argument on behalf of the respondents that the 160-acre limitation was conceived as a socialistic scheme to divide up private property for the benefit of the many at the expense of "larger landowners." It may not be denied that the 160-acre limitation originally had a social objective. It was designed to encourage home seekers to obtain and develop land owned by the federal government in the undeveloped western states and territories. The plan sought to arouse the interest of as many settlers as possible and to prevent, so far as could lawfully be done, the accumulation of large tracts of land by single individuals. This the government, as sole owner, could do as it pleased, without let or hindrance.

Contrasted with the social objective of a land limitation in furtherance of the plan to encourage individuals as home seekers to purchase government lands and to initiate and increase the productivity of undeveloped public lands was the objective of the federal government in another field. That was in the grant to corporations seeking to provide transcontinental transportation of alternate sections of land for 20

miles on each side of the railroad right of way, as provided for in various acts of Congress. (See 43 U.S.C. § 881, et seq.) In a large sense it may be said that those grants had the social objective of aiding in the increase in population and development of the vast uninhabited expanse of land owned by the federal government by affording transportation more convenient, timely and certain than the covered wagon, the stage coach and the pony express.

The foregoing objectives and others which might be mentioned were well within the power and control of the federal government as the owner of the lands to be granted or otherwise disposed of. But we are not here dealing with social objectives as such. We are here concerned with the question of the extent of power, dominion and control which the United States as a trustee may exercise to deprive beneficiaries of the trust, namely, the water users of the state and particularly those in the plaintiff district, of a property right thereunder or of an inchoate right to the use of water within the district.

Under articles 34, 35, 36, and 37 of the contract, the owner of land in excess of 160 acres is called a "large land owner," and lands in excess of 160 acres are called "excess lands." If a so-called "large land owner" desires to avail himself of the benefits of project water on any of his lands, he must select from his larger tract 160 acres of land which is to be retained by him for the use of water. If the landowner refuses to make the selection, the members of the board of directors of the district may do so without his consent. If they do not, the Secretary of the Interior makes the selection. Excess lands may not receive water unless prior thereto the landowner executes a recordable contract between himself and the United States, whereby he agrees to sell his land in excess of 160 acres within 10 years at a price to be fixed by an appraisal board consisting of one appraiser appointed by the district, one by the Secretary of the Interior, and the two choosing a third. The landowner has no voice in the appraisal. The appraised value must be fixed as of the time of the execution of the recordable agreement and the appraisal cannot take into consideration any increase in the value of the land resulting from the supply of water to the land, or from any other normal increase in value such as might result from an increase in population, an extraordinary increase in the productivity of the land or perchance the discovery of oil or other valuable substances beneath the land. In practice, according to official government statements, the interpretation

placed on contractual provisions required by federal law (Section 46, Omnibus Adjustment Act of 1926, 44 Stats. 636) similar to the excess land provisions here is as follows: "Thus the administrative procedure usually adopted had been to refuse to deliver water to any lands, excess or non-excess, until the owner of excess land has executed a recordable contract agreeing to dispose of the excess." (Land Ownership Survey on Federal Reclamation Projects, Department of the Interior [1946], p. 47.)

It thus appears that the federal statute as interpreted by those administering it states in effect to the owner of land within the district susceptible of irrigation: "If you own more than 160 acres of land within the District you may not enjoy one of the incidents of that ownership, namely, the right to the use of water to which you are entitled on all your land unless you agree to execute a recordable contract to sell your land in excess of 160 acres within 10 years at a price fixed by a board of appraisers in whose selection you have no voice and at a price to which you do not agree." In addition, no account is taken of the item of possible damage to the remainder of the land because of a possible severance, and a possible natural increment in land values.

The duty of both of the contracting parties in the performance of their obligations to the landowners in the district is set forth in section 22250 of the Water Code. It is there provided that water distributed by districts shall be "apportioned ratably to each landowner upon the basis of the ratio which the last assessment against his land for district purposes bears to the whole sum assessed in the district" except as provided otherwise in the code. No pertinent exceptions appear.

In addition to his right to due process, the landowner McCracken is entitled to equal protection of the laws. Discrimination among water users in an irrigation district is expressly contrary to state law as expressed in the above quoted section 22250 of the Water Code. The well established rule on this subject is expressed in *City of Pasadena* v. *Stimson*, 91 Cal. 238 at pages 251 and 252 [27 P. 604] as follows: ". . . although a law is general and constitutional when it applies equally to all persons embraced in a class founded upon some natural or intrinsic or constitutional distinction, it is not general or constitutional if it confers particular privileges or imposes peculiar disabilities or burdensome conditions, in the exercise of a common right, upon a

class of persons arbitrarily selected from the general body of those who stand in precisely the same relation to the subject of the law.'' (See also *Matter of Application of Miller,* 162 Cal. 687, 698 [124 P. 427].) Notwithstanding the fact that the 160-acre limitation has been a part of the Reclamation Law for more than 50 years, a diligent search has failed to disclose that the imposition of the limitation has been approved by any court of last resort, either state or federal, in a situation where the federal government had no interest in the lands to be irrigated and possessed only a trustee's interest in the waters to be applied. On the other hand the Supreme Court of Wyoming in *Owl Creek Irr. Dist.* v. *Bryson, supra* (1953), 71 Wyo. 30, beginning at page 67 had the following to say with reference to the terms of a contract similar as to the excess land provisions to the terms of the present contract: ''The large landowner is specifically defined in this subdivision and additional burdens imposed upon him. He is forbidden to receive water for excess lands until he acquiesces in all the conditions which by this and the two proceeding paragraphs are placed upon him. . . . These contract clauses which are thus questioned if applied to owners of private lands are unreasonable, coercive and devised to deprive them of their property against their will and without invoking the condemnatory processes which require due compensation to be made when land is thus taken. These processes embody the full protective machinery of the law as concerns the private property owner. These clauses now drawn in question . . . are subversive of the most elementary rights which our forefathers carried from English law to this country and which were centuries in their formation. . . . It is quite obvious if these contract clauses were to be scrutinized under the light of familiar constitutional limitations they would necessarily fall.''

■ As to the acreage limitation of the contract, it is therefore concluded that the extent of the right of an owner of real property to the use and enjoyment of his property right, including the water right which may be attached thereto, cannot be constitutionally limited on the sole basis of the amount of property he owns. This is especially true with reference to property of the same kind and similarly situated. If there are any exceptions to the rule which should be applied, they have not been pointed out, nor, on reflection, are they apparent. ■ In other words there appears to be no basis founded in reason or authority why the owner of a property

right which is or may be appurtenant to all of his land suitable for irrigation can be limited in the enjoyment of that right to 160 acres of his larger holdings. The same right should attach to his lands in excess of 160 acres and to the excess lands of all those similarly situated. Thus to deprive members of the same class of their rights clearly results in an unlawful discrimination which as said in *Pasadena* v. *Stimson, supra,* 91 Cal. 238, is not "founded upon some natural or intrinsic or constitutional distinction." If a constitutionally authorized preferment may be extended only to owners of 160 acres of land or less the question might well be asked whether a like preferment might not be extended only to owners of more than 160 acres. The suggestion of either preferment under the long and well established rule governing classification is enough to demonstrate its impropriety.

 Notwithstanding the long prevailing provisions of the original Reclamation Act of 1902 that in the construction and operation of the reclamation projects under the supervision of the Secretary of the Interior, rights vested under state law should not be disturbed and should be protected, the contract in controversy is proposing to transgress those vested rights. The plaintiff district and the United States, through its Bureau of Reclamation, are parties to the contract but as to both the record discloses that they deemed themselves bound by federal law to include these provisions in the contract. That law is included in the original Reclamation Act of 1902. (32 Stats. p. 388.) It was reenacted and supplemented by the Omnibus Adjustment Act of 1926 as amended. (44 Stats. 636, § 46, now U.S. Public Lands Code Anno., 1955, § 423e.) Section 46 of that act requires that any contract with an irrigation district bearing the approval of the Secretary of the Interior shall include the 160-acre limitation. It is to be noted that this omnibus act covers many subjects dealing generally with federal reclamation projects where the intention of the act as shown by section 48 was the development of public lands and the rehabilitation of some 20 federal reclamation projects theretofore existing in many of the western states. The omnibus act is now included, in material parts, in Title 43 United States Code, sections 1 to 670, inclusive. This volume is entitled "The Code of the Laws of the United States of America, Title 43, Public Lands." A survey of this code shows that its provisions deal generally with the control, development and sale of public lands of the United States and section 46 may be deemed to apply to public lands

alone. If, however, its general language as to the 160-acre limitation be considered as applicable to the purchase by the United States of unappropriated domestic waters of this state and, as here, its distribution to irrigation districts and privately owned lands in the state, such a construction would obviously remove it from consideration as an "applicable" law governing the execution of the contract in question. Since its attempted application to the contract is unauthorized under the laws of this state it is necessarily not an "applicable" law. Also carried into the Public Lands Code of the United States is the provision of the original Reclamation Act of 1902 that state laws remain unaffected by later enactments. This was recognized by the Supreme Court in the Gerlach case as late as 1950 where it said that when Congress directed the Secretary of the Interior to proceed under the Reclamation Act of 1902 he should not interfere with the laws of the state " 'relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder.' (32 Stats. 388, 390.)." (*United States* v. *Gerlach Livestock Co., supra*, 339 U.S. 725, at page 739.) As indicated the federal law could be applicable only on the theory that the United States is the owner absolute of the domestic waters of the state with the right to the use thereof freed from any trust relationship on behalf of the real owners thereof, namely, the water users in the district. As also indicated such a theory is untenable and it necessarily follows that the inclusion in the contract of articles 34, 35, 36 and 37 cannot be legally justified.

Attention has been called to section 23200 of the Water Code providing that under contracts such as the one in question water "shall be distributed and apportioned by the district in accordance with the applicable acts of Congress, the rules and regulations of the Secretary of the Interior thereunder, and the provisions of the contract." It is argued that since the 160-acre limitation is contained in the Federal Reclamation Act of 1902 the state, the owners of irrigable lands and the water users are subject to that limitation. But such is not the case. Section 23200 contemplates that *applicable* federal law shall apply. As previously noted the 160-acre limitation is inapplicable in the present case where the title to the water to be purveyed is not an unlimited title in the United States.

An important question relating to the debter-creditor nature of the contract is raised by the attorney general and concerns

matters which the State Engineer as Chief of the Division of Water Resources deems essential to what is said to be the established water law in this state. We have heretofore declared the debtor-creditor nature of the contract in question. In arriving at that conclusion it was considered that applicable federal law requires that the contract specify a specific amount of money to be repaid by the district by installments, within 40 years; that this is an obligation for repayment of the cost of construction of storage and delivery works, and that the payments by the district be credited against this obligation.

The attorney general asserts that this is an incorrect construction of the federal Reclamation Project Act of 1939 (53 Stats. 1195, 1196). He states that under present federal law the repayment of construction costs to the United States is governed by both section 9(d) and 9(e) of that act. Section 9(d) provides in part:

"No water may be delivered for irrigation of lands in connection with any new project, new division of a project, or supplemental works on a project until an organization, satisfactory in form and powers to the Secretary, has entered into a repayment contract with the United States, in a form satisfactory to the Secretary, providing among other things . ... (2) That the part of the construction costs allocated by the Secretary to irrigation shall be included in a general repayment obligation of the organization . . . (3) That the general repayment obligation of the organization shall be spread in annual installments, of the number and amount fixed by the Secretary, over a period not exceeding forty years, exclusive of any development period fixed. . . ."

As section 9(d) is read in the light of its particular provisions and of the general law, it is authority for the terms of Part B of the contract which provides for the repayment of a stipulated sum in installments within 40 years. If the construction obligations are not paid within the times specified, the remedies for the enforcement of payment by assessment, taxation and possibly other means are provided for in the contract.

Section 9(e) of the Reclamation Project Act of 1939 provides: "In lieu of entering into a repayment contract pursuant to the provisions of subsection (d) of this section, to cover that part of the cost of the construction of works connected with water supply and allocated to irrigation, the Secretary, in his discretion, may enter into short- or long-term contracts to furnish water for irrigation purposes. Each sub-

contract shall be for such period, not to exceed forty years, and at such rates as in the Secretary's judgment will produce revenues at least sufficient to cover an appropriate share of the annual operation and maintenance cost and an appropriate share of such fixed charges as the Secretary deems proper, due consideration being given to that part of the cost of construction of works connected with water supply and allocated to irrigation, and shall require payment of said rates each year in advance of delivery of water for said year. In the event such contracts are made for furnishing water for irrigation purposes, the cost of any irrigation water distributing works constructed by the United States in connection with the new project, new division of a project, or supplemental works on a project, shall be covered by a repayment contract entered into pursuant to said subsection (d)."

In view of the last sentence of section 9(e), it is conceded by the attorney general that Part B of the contract for the construction of the physical works is a repayment contract, but the question raised is whether the water delivery portions of the contract (Part A) are invalid because of inferences which may be drawn that the district and landowners therein are not entitled to water rights which continue beyond the 40-year term of the contract.

It is contended by the attorney general that the United States has properly contracted as a water purveyor under section 9(e). The State Engineer contends that the United States improperly assumes to take section 9(e) as its authority for an alternate method of contracting with the state, that is, that the United States has construed that section to mean that, in lieu of a definite contract for repayment within 40 years, the United States may waive or avoid the repayment provisions in regard to its water rights and obligation to supply water to the district and substitute therefor the right to renew or not to renew the contract as the occasion might suit its purpose and elect to continue to serve the district with water but under terms and conditions which it might impose in the nature of an utility service, with no power upon the part of the district as the contracting agency of the state to prevent it from so doing. It is claimed by the State Engineer that the United States and particularly the Bureau of Reclamation and its legal advisers have decided that section 9(e) contains such authorization. The record supports that contention by documents and transcripts of hearings before

Congressional committees which need not now be set forth at length.

It is because of this asserted authorization to the Bureau of Reclamation that the State Engineer is much concerned. The effect of the validation of this contract would be, impliedly at least, to approve a procedure by which the United States as a purveyor of the domestic waters of this state, might continue indefinitely to by-pass the established law of the state and procedures thereunder applicable to water services generally.

In furnishing its domestic waters to consumers at a price, the activities of the United States under its purported construction of section 9(e) resemble those of a public utility acting in a proprietary capacity. ██ As above noted, the Reclamation Act of 1902 provided that: "Nothing in this act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any state or territory relating to the control, appropriation, use or distribution of water used in irrigation, or any vested right acquired thereunder and the Secretary of the Interior, in carrying out the provisions of this act, shall proceed in conformity with such laws. . . ." It may fairly be said that the foregoing federal statutory provision remains in full force; that it controls the operations of the Department of the Interior so far as federal law is concerned, and that under the controlling state law, the furnishing of water to consumers by a utility must be subject to and be in conformity with certain rules and regulations established by or under the authority of the Constitution and the statutes of the state.

██ Moreover, as we have already held, whatever title the United States has to the domestic waters of this state is limited by the trusteeship under which that title was acquired. The United States cannot administer the corpus of that trust except in the manner defined by the terms of the trust, namely, the applicable water law of this state. The attorney general argues that in this validation proceeding it is not necessary to consider what might or might not be contemplated at the termination of the contract, but the water rights of the landowners in the district, as members of the class to which the beneficiaries of the declared trust belong, are present and existing (see *Ickes* v. *Fox*, 300 U.S. 82, 93-94 [57 S.Ct. 412, 81 L.Ed. 525]), and they are entitled to a declaration thereof. "By directing the Secretary to proceed under the Reclamation Act of 1902, Congress elected not 'to in any way interfere with the laws of the State . . . relating to the

control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder.' '' (*United States* v. *Gerlach Livestock Co., supra,* 339 U.S. 725.) ▓ If this contract were construed as imposing upon the district and the landowners therein a burden under which they may suffer the loss of water rights at the discretion of the United States, such a construction would be contrary to well established constitutional principles and protections.

▓ The validity of the .contract is sought to be established under the Second Validating Act of 1949. (Stats. 1949, p. 1511.) The attitude of the United States is reflected in the position of the attorney general to the effect that ''any non-constitutional defects in the contracts under state law'' were cured by the act.

The act became effective on October 1, 1949, which was 90 days after the final adjournment of the Legislature of that year. The act ''confirmed, validated, and declared legally effective . . . all Acts and proceedings heretofore taken by a public body under any law, or under color of any law, for the authorization'' of ''all instruments evidencing indebtedness of a public body incurred or to be incurred for any public purpose. . . .'' The act includes proceedings taken by ''counties, cities and counties, cities, public districts of every kind or class'' and some 50 other specifically named public bodies, including irrigation districts. The attorney general contends that ''this language clearly covers contracts between irrigation districts and the United States for a water supply and distribution system construction.''

In this connection it appears that at the time the Second Validating Act of 1949 was passed by the Legislature the contract was not in existence; that it was not approved by the electors of the district until August 23, 1949, and that it was not signed until September 23, 1949. ▓ It would seem that validating statutes cover only those transactions or omissions which occur before the Legislature adjourns. Such acts no doubt serve a useful purpose but as said by Chief Justice Beatty in *Oakland* v. *Oakland Water Front Co.,* 118 Cal. 160 at pages 194 and 195 [50 P. 277]: ''It is to be regretted . . . that a court should ever feel itself bound by rules of construction to give effect to statutes which ratify and confirm by wholesale the acts of municipal or other political agencies of the state. There is no more reckless or dangerous species of legislation. It is really legislating with the eyes shut, and . . . should . . . be closely scrutinized and strictly

considered in order to prevent as far as possible the evils which they involve. . . .''

If the position of the attorney general be sustained, it would mean that from the time of the final adjournment of the Legislature on July 2, 1949, to October 1, 1949, every city, city and county, county, and some 50 specifically named other public entities or agencies of the state could run full rein in violation of all of the laws of the state governing and regulating the making of contracts and the incurring of obligations for the payment of public moneys thereunder not constitutionally otherwise controlled. Likewise, within that 90-day period they could do anything not yet subjected to regulation but which could be constitutionally authorized and this situation would continue during the 90 days after the final adjournment of the Legislature. A validation act assumes legislative consciousness of some act or omission on the part of the public body affected which is designed to be cured or confirmed. After the final adjournment of the Legislature and until the effective date of the act (90 days thereafter) there is no opportunity for the exercise of this legislative purpose to function. Obviously the only purpose of postponing the effective date of the act is to permit the referendum provisions of the law to be made available.

 Furthermore if the contract be deemed to include a utility type contract at the option of the United States, the Second Validating Act of 1949, or any validating act of the character of the one here relied upon by the attorney general, could not render such a contract valid. It is well settled that the Legislature may ratify only what it could have theretofore authorized. It is obvious that the Legislature could not by a general ratifying statute breathe validity into a contract the effect of which would be to avoid all of the laws of the state, both constitutional and statutory, respecting the regulation and control of public utilities in this state. Assuming the plenary power of the Legislature to enact laws respecting the regulation and control of public utilities notwithstanding any provision of the Constitution to the contrary, (Art. 12, § 22, Constitution) nevertheless such legislation must appear on its face to be cognate and germane to the regulation of public utilities to come within the Legislature's plenary power. (*Pacific Tel. & Tel. Co.* v. *Eshleman,* 166 Cal. 640, 655, 656 [137 P. 1119, Ann.Cas. 1915C 822, 5 L.R.A.N.S. 652].) There is nothing on the face of this ratifying statute to indicate in the slightest degree

that it relates to the regulation and control of public utilities. It is therefore ineffective to circumvent the laws of the state requiring regulation and control of activities which are in all essential respects those of a public utility. In addition any validating act could not have confirmed the 160-acre limitation for the obvious reason that the Legislature could not have theretofore constitutionally authorized it.

■ The district attorney of Ventura County has filed a brief as amicus curiae on behalf of the Ventura County Flood Control District. He calls attention to the declaration of the trial court in its conclusions of law to the effect that when water is furnished by a purveyor of water under the laws of this state to a landowner for irrigation purposes such owner thereby acquires a vested right to the continuance of such service.

Objection to the views of the trial court in this respect is made on the ground that they do not correctly reflect the present laws of the state on the subject. This is the only cause of concern on the part of counsel for the flood control district. The background for this objection is disclosed by the following facts: The Ventura Valley has highly developed urban and interurban industrial and agricultural areas which have been subjected to a shortage of water with threatened need of further sufficient supply. To alleviate this water condition the Ventura County Flood Control District was organized under chapter 44 of the Statutes of 1943 (p. 168). One storage dam has been constructed and another is in the course of construction or nearly completed. The distribution systems have not been completed but water is stored in the reservoirs. Pending the completion of the distribution systems the district is furnishing to certain lands outside of the district some of the stored water under contracts with the users that when the system within the district is completed and water made available to landowners within the district the use of water outside of the district will terminate. This arrangement was made because of the dire need of water on lands without the district for even temporary purposes and perhaps to tide the owners thereof over to a time when they could develop an additional supply of water on their own behalf. If this temporary agreement with the outside land owners is not permitted because of the declaration of the trial court, increasing amounts of water now in storage and to be stored in the reservoirs of the Ventura district will be required to go to waste.

There is no law of this state which may properly be invoked to prevent such a temporary arrangement. The question is pertinent to the present case because of the fact that a supplemental water supply has been furnished to land owners in the Ivanhoe Irrigation District by the United States for an extensive period pending the negotiations for a contract such as involved in the present proceeding.

There appear to be early cases to the effect that when a purveyor of the domestic waters of the state furnishes water to lands for irrigation purposes, the right of the owner of the lands to a continuance of the use may not be cut off. The rules of the earlier cases have in general been modified by enactments in the Water Code of the state with reference to the use of water as authorized by the Constitution. As bearing on the right acquired by user in particular cases, including the rights of landowners in connection with the administration of the water law of the state the Legislature has provided in division 11 (irrigation districts), part 5, chapter 2, article 2 (water distribution, § 22262) as follows: "No right in any water or water right owned by the district shall be acquired by use permitted under this article." (Stats. 1943, p. 1897, based on Stats. 1897, p. 259.) An identical provision is contained in that portion of the code pertaining to Water Districts (Wat. Code, § 35428). Other code provisions provide authority for entities supplying public water to serve some of their territories with water and not serve others in the event of shortages. (Wat. Code, §§ 22252.1, 35435; Pub. Util. Code, §§ 2708, 2710, 2711.)

It is claimed that article 26 of the contract purports to condition the delivery of water to a landowner otherwise entitled to delivery, upon the payment by him of any assessment levied although it has been judicially declared to be a void assessment. It seems unusual that a party should, except under compulsion, contract to pay an assessment declared to be void by a court of competent jurisdiction. But when taken as a reasonable and additional assurance of reimbursements to the United States for expenditures incurred on behalf of the district and to cover operating expenses in furnishing water to the district, it may be deemed a legitimate subject of contract.

Questions are raised as to the sufficiency of the notice of election whereby the electors of the district were called upon to approve the proposed contract, and the trial court con-

cluded that the contract was invalid for lack of proper notice. (Wat. Code, § 23223.) These questions need not be determined in this case for the reason that upon submission of any further proposed contract they need not recur.

The trial court in its findings of fact and conclusions of law declared the contract to be invalid on numerous additional grounds not carried into the judgment. Conclusions that the contract is uncertain, lacks mutuality, improperly delegates powers to the Secretary of the Interior, improperly prevents changes in the boundaries of the district, provides unreasonable security measures to the United States and other conclusions not necessary to the judgment are insufficiently supported when considered in connection with the views herein expressed as to the terms under which the parties may properly contract.

In accordance with the foregoing it is concluded:

(1) That the plaintiff is an irrigation district duly organized, existing and operating as such under the laws of this state.

(2) That the title to the unappropriated domestic waters of the state is in the State of California in trust for the water users of the state as beneficiaries and such waters are subject to appropriation under the laws of the state.

(3) That the United States as assignee of appropriative rights, as original appropriator thereof, and in the acquisition of other rights for the same purpose stands in the same relation to such beneficial owners as does the state, namely, as trustee for such beneficial owners and is answerable for the faithful performance of that trust.

(4) That in distributing the water contracted to be delivered to the District the United States does so as a purveyor of water at a price for the benefit of the water users of the District.

(5) That in so delivering the water to the District it is not competent for the United States or the District, either or both, to discriminate against the present or potential water users in the District on the basis of the amount of land owned by them, and that the 160-acre limitation contained in the original Reclamation Act is inapplicable to the subject matter of the contract and is improperly contained therein.

(6) That insofar as the contract provides for the construction of works for the storage and distribution of

water to and by the district, the relationship of the parties is that of contractor and contractee. Upon the completion of the construction work the district is obligated under the law to pay for the same within 40 years in equal annual installments. Upon the completion of such payments the district is entitled to ownership of the works and property of the storage and distribution system free from any claims of the United States.

 (7) That insofar as the contract provides for furnishing water to the district at a price the United States in acting as a purveyor of domestic waters of the state to the district, under federal law, is bound to observe and comply with the laws of the state with reference to the rights which are vested in the water users being served or entitled to be served. In this respect neither the state nor any of its agencies may contract or otherwise provide that the distribution of water to those for whose benefit the right to the water was acquired may be arbitrarily discontinued.

The judgment is affirmed.

Schauer, J., Spence, J., and McComb, J., concurred.

GIBSON, C. J.—I dissent.

The holding of the majority opinion, which invalidates the 160-acre water limitation and other vital provisions of the contract between Ivanhoe Irrigation District and the United States Government, undermines the very foundation of federal reclamation policy and threatens to end the flow of federal funds into this state for reclamation and irrigation purposes at a time when the need for rapid development of our water resources is most critical. In reaching its conclusion the majority ignores the Irrigation District Federal Cooperation Law of this state, relies on a statutory provision relating to the apportionment of water by districts which is inapplicable to water from a federal project, and enunciates a trust theory with respect to the ownership of water which has no basis in existing law, is unsound in principle, and will prove a serious obstacle in the resolution of state-wide problems involving the distribution and utilization of available water supplies for domestic and industrial purposes, the irrigation of land, and the production of power.

The Central Valley Project, which is now nearing completion, is a federal undertaking being built under the provisions

of the national reclamation laws. Since the passage of the Federal Reclamation Act in 1902, the federal statutes have imposed a limit on the amount of irrigation water from federal projects which will be sold to any one landowner, namely, sufficient water to meet the needs of 160 acres of land. In California, by reason of our community property law, the limitation has been interpreted as allowing a man and wife to buy sufficient water to supply 320 acres. (Graham, *"The Central Valley Project: Resource Development of a Natural Basin"* (1950), 38 Cal.L.Rev. 588, 608-611.) The restriction is not a limit on the amount of land a person may own. There is nothing in the governing federal statute, section 46 of the Omnibus Adjustment Act of 1926, which compels an individual who owns more than 160 acres to sell any of his land as a condition to receiving water sufficient for 160 acres. (44 U.S. Stat. 649, 43 U.S.C.A. § 423e (Supp. 1955).) He may retain all his land, receiving federal project water for the first 160 acres and irrigating the remainder with whatever other water may be available. It is only where he elects to request delivery of federal project water for the portion of his land in excess of 160 acres that he may be compelled to dispose of the excess land within a period of time fixed by the Secretary of the Interior. (See Graham, op. cit., 38 Cal. L.Rev. at pp. 606-608.)

The suggestion that the limitation may not have been intended to apply to lands held in private ownership prior to construction of a reclamation project flies in the face of specific language in the statute of 1902, which provides that no right to the use of water "for land in private ownership shall be sold for a tract exceeding 160 acres to any one landowner. . . ." (32 U.S. Stat. 389, 43 U.S.C.A. § 431.) Subsequent enactments contain similar provisions making specific reference to lands in private ownership. (36 U.S Stat. 926 (1911), 43 U.S.C.A. § 524; 37 U.S. Stat. 266 (1912), 43 U.S.C.A. § 544; 38 U.S. Stat. 689 (1914), 43 U.S.C.A. § 418; 44 U.S. Stat. 649-650 (1926), 43 U.S.C.A. § 423e (Supp. 1955); see Graham, op. cit., 38 Cal.L.Rev. at p. 616.) The Omnibus Adjustment Act of 1926 expressly requires that contracts between the federal government and irrigation districts shall contain the acreage limitation as a condition to delivery of water from a federal project. (44 U.S. Stat. 649-650, 43 U.S.C.A. § 423e (Supp. 1955).) Thus the water limitation in the Ivanhoe contract follows the requirement of the federal

statute, and, unless the statutory limitation may properly be construed as inapplicable in California, or is declared unconstitutional, or is removed from the law by congressional action, the representatives of the federal government would have no power to negotiate a new contract without it.

Local irrigation districts are authorized by *state law* to enter into contracts with the federal government for a water supply *on terms required or authorized by federal law.* Direct authority for the action of the Ivanhoe district is found in the California Water Code which, since its adoption in 1943, has contained a chapter known as the Irrigation District Federal Cooperation Law (§ 23175 et seq.), most provisions of which are based on statutes originally enacted in 1917 (Stats. 1917, ch. 160). Section 23195 provides: "Districts may cooperate and contract with the United States under the Federal Reclamation Act of June 17, 1902, and all acts amendatory thereof or supplementary thereto or any other act of Congress heretofore or hereafter enacted permitting cooperation." No delegation of legislative power is involved, and the state law clearly authorizes a contract which includes the provisions of the Federal Omnibus Adjustment Act of 1926. Section 23196 of the Water Code authorizes districts to contract with the United States for a water supply and for acquisition and operation of works for irrigation.

With respect to the delivery, distribution, and *apportionment* of water among irrigators, section 23197 provides that district contracts with the federal government may include provisions for "(a) Delivery and distribution of water for the land in the district *under the relevant acts of Congress and the rules and regulations established thereunder. . . ,*" and section 23200 provides, "All water, the right to the use of which is acquired by a district under any contract with the United States shall be *distributed and apportioned by the district in accordance with the applicable acts of Congress, the rules and regulations of the Secretary of the Interior thereunder, and the provisions of the contract, . . .*" (Italics added.)

The majority takes the position that sections 23197 and 23200 must be construed as referring only to federal acts which do not conflict with state law and that the 160-acre limitation in the contract is invalid because it assertedly conflicts with section 22250 of the state Water Code which provides that water shall be apportioned ratably to each landowner on the basis of the last assessment against his land for

district purposes.[1] The only reasonable interpretation of sections 23197 and 23200 is that the Legislature intended to authorize irrigation districts to enter into contracts with regard to the delivery, distribution, and apportionment of federal project water under the terms imposed by Congress as a condition to participation of the federal government in such contracts. The substance of section 22250 is contained in statutes enacted long before there was any water limitation in the federal reclamation law and before this state adopted the Irrigation District Federal Cooperation Law, the express purpose of which was to enable irrigation districts to secure the assistance of the United States Government in obtaining a water supply. Moreover, section 22250 is a *general* provision governing the distribution of irrigation water by districts, and it is obviously qualified by the more recent provisions in sections 23197 and 23200 which relate *specifically* to the distribution and apportionment of federal project water under contracts between irrigation districts and the United States. As we have seen, sections 23197 and 23200 authorize the acquisition of a supply of water from the United States and direct that such water shall be distributed and *apportioned* by the district in accordance with the applicable acts of Congress, the rules established thereunder, and the provisions of the contracts. It follows that section 22250 cannot prevail here in the face of the water limitation which is required by the federal statute and which is thus authorized by sections 23197 and 23200.

It should also be noted in considering the effect of section 22250 that the statute should not be interpreted as fixing the exclusive method of apportioning available water among landowners in all irrigation districts in the state. Section 22250 appears in part 5 of division 11 of the Water Code relating to the powers and purposes of irrigation districts, and, to be at all intelligible, it must be read in connection with the provisions in part 5 and elsewhere relating to the financing by a district of the cost of constructing, maintaining and operating an irrigation system. Aside from incidental

---

[1]Section 22250 of the Water Code provides: ''All water distributed by districts for irrigation purposes shall except when otherwise provided in this article be apportioned ratably to each landowner upon the basis of the ratio which the last assessment against his land for district purposes bears to the whole sum assessed in the district for district purposes.'' The substance of this section was included in the statutes of 1887, page 34, section 11. It also appears in the statutes of 1897, page 259, section 18.

sources of revenue, there are two major methods of financing a district irrigation system under the Water Code: (1) ad valorem assessments on land in the district (§ 25500 et seq.; see § 25503); and (2) tolls charged to district irrigators for water delivered and other services (§ 22280 et seq). Where all district costs are financed by levying ad valorem assessments on district land, the formula for water apportionment set out in section 22250 is clearly applicable and, when coupled with a provision such as section 22251 authorizing a landowner to assign any or all water apportioned to him, is reasonable. (*Fallbrook Irr. Dist.* v. *Bradley* (1896), 164 U.S. 112, 162-163 [17 S.Ct. 56, 64, 41 L.Ed. 369].) But, once an irrigation system is in operation and the district, as it may, finances a share or all of its expenses by means of charging rates or tolls to actual water users, it seems clear that the formula for water apportionment in section 22250 is not intended to apply.

The uncertainties and inequities of the assessed-land-value formula for water apportionment were discussed in *Willard* v. *Glenn-Colusa Irr. Dist.* (1927), 201 Cal. 726, 741-743 [258 P. 959], where this court upheld the constitutionality of a 1911 statute providing that, "In lieu (either in part or in whole) of levying assessments," irrigation districts have the power to raise all or part of the cost of operating and maintaining an irrigation system by means of charging rates or tolls to actual water consumers. (Cal. Irrig. Dist. Act, § 55, Stats. 1911, p. 516 [now Wat. Code, § 22280]; see Water Code, § 25655.) It was pointed out that the assessed-land-valuation formula for water apportionment created hardship and uncertainty for owners of land having a relatively low assessed valuation but containing crops which required more water than the land would be entitled to under the formula for water apportionment. "On the other hand," states the opinion, "by giving to the board of directors [of an irrigation district] the power to raise the whole or a part of the cost of maintenance by tolls . . . every land owner of the district is given an opportunity to the extent of the water supply of the district of securing a definite, certain, and adequate supply of water for his lands." (201 Cal. at p. 743.) While the question of water apportionment was not before the court, the language of the opinion clearly indicates that the formula for apportionment in section 22250 is not applicable in a situation where all or part of the district expenses are paid

by means of charging rates or tolls to actual water users rather than by levying an ad valorem tax on district land.

Ivanhoe and most of the other irrigation districts in the state have adopted the practice of defraying costs of maintenance and operation by means of a combined system of levying assessments and charging rates or tolls to actual water users. (See *Willard* v. *Glenn-Colusa Irr. Dist.*, 201 Cal. at p. 744; Cal. Dept. of Pub. Works, Div. Water Resources, Bull. 21K, "Report on Irrigation Districts of California for the year 1939," pp. 8, 22; *ibid.*, Bull. 21P, "Report on Irrigation Districts in California, 1944-1950," appendix.) The services for which tolls and rates may be charged have been gradually extended. (See Wat. Code, § 22280.) Section 25655 provides that revenues derived from such rates or tolls may be spent for "district purposes" generally, and section 25219 authorizes their use to pay principal and interest on construction and refunding bonds. Hence most, if not all, district expenses may ultimately be financed not by assessments but by tolls charged to actual water and power consumers (see *Willard* v. *Glenn-Colusa Irr. Dist.*, 201 Cal. at pp. 740-741), and the Legislature could not have intended that the water apportionment formula in section 22250 should be applicable under such circumstances.

Even if it be assumed, for the sake of argument, that there is a conflict between section 22250 and the water limitation provisions of the federal statutes, the assertion by the majority that section 8 of the 1902 Reclamation Act provides for the supremacy of state law is untenable. Section 8 provides: "Nothing in this chapter shall be construed as affecting or intended to affect or in any way interfere with the laws of any State or Territory relating to the control, appropriation, use or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this chapter, shall proceed in conformity with such laws. . . ." However, as stated in *Nebraska* v. *Wyoming* (1945), 325 U.S. 589, 612, 615 [65 S.Ct. 1332, 89 L.Ed. 1815], section 8 will not be construed in every instance to mean that "where Congress has provided *a system of regulation* for federal projects it must give way before an inconsistent state system." (Emphasis added.) In the present case it is conceded that all water rights necessary to construction of the irrigation system have been acquired by the federal government in strict compliance with state law. The

question before us is how a future supply of water from the completed federal project, *water not hitherto available,* shall be apportioned among district landowners. The 160-acre water limitation is clearly part of a "system of regulation" for federal projects within the meaning of the language quoted above from *Nebraska* v. *Wyoming* and thus appears to fall in that area where section 8 does not compel federal law to give way before inconsistent state legislation; hence, if there is any state-recognized vested right which, in fact, conflicts with the acreage limitation, that right may be taken and compensated for by the federal government under its power of eminent domain. (See *United States* v. *Gerlach Live Stock Co.,* 339 U.S. 725, 733, 739 [70 S.Ct. 955, 94 L.Ed. 1231]; 32 U.S. Stat. 389, 43 U.S.C.A. § 421 (Supp. 1955); Rivers and Harbors Act of 1937, § 2, 50 U.S. Stat. 844, 850.) The question of compensation for loss or threatened invasion of a vested water right is not before us.

In holding the Ivanhoe contract invalid, the majority opinion invokes the aid of a "trust" theory assertedly based on general state law. The theory is that unappropriated domestic water is owned by the state in trust for water users and that the federal government can acquire no title to appropriative water rights free of such trust. For reasons hereinafter stated, it is my opinion that the trust theory is erroneous, but, if it be assumed that such a trust exists, it is clear, as indicated above, that there is nothing in the federal water limitation which conflicts with state law, state water policy, or the best interests of the water users of the state, hence nothing which can be held to constitute a breach of trust.

There is no legal basis for the trust theory developed by the majority opinion. The Constitution and statutes of California reserve to the state considerable control over the use to which domestic water shall be put but contain nothing which creates a trust as to such waters. Section 3 of article XIV of the Constitution provides in substance that the water resources of the state must not be wasted, that conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare, and that the right to the use or flow of water from any natural stream or water course in the state is limited to such water as shall be reasonably required for the beneficial use to be served. Sections 104 and 105 of the Water Code provide, in effect, that the state may regulate the use of water in the interest of the people. These and

other general regulatory provisions apply to all water and water rights, whether riparian, appropriative or underlying, and whether privately or publicly owned.

The fact is that no declaration of trust is intended or effectuated by these general provisions enunciating water policy and providing for regulation, and they are in no way inconsistent with the existence of full title to water rights in the state or in private persons. While the use to which certain property may be put is controlled by state law, this does not mean that the owner thereof has something less than full title. It adds nothing to the strength and effectiveness of the laws regulating the use of water to say that they give rise to a trust relationship between the state and water users, but, to the contrary, such language threatens to confuse the development of our water law. The very use of the term "trust" draws with it the problem of applying settled trust principles to all water rights in the state, or at least to those acquired by appropriation—a problem which will certainly be attended by much uncertainty and difficulty.

Let us examine the trust theory as applied to the water rights involved in the present proceeding. The United States is acquiring the water rights necessary to completion of the project by means of (1) assignment of applications for appropriation made by the state, (2) applications for appropriation made directly by the United States, and (3) purchase and exchange agreements made by the United States with certain private owners of riparian rights to divert the flow of the San Joaquin River. (Graham, op. cit., 38 Cal.L.Rev. 596-600.) With regard to the first two, which relate to hitherto unappropriated water, even if it be assumed that all unappropriated water and water to which an appropriative right is not fully perfected belongs to the state, the ownership rights of the state do not differ from its rights in other state-owned property. Certainly the state has full title to the water and water rights which belong to it, and the people, acting through their representatives and within the limits of the Constitution, may dispose of it as they see fit. There may be occasions when the state would find it necessary to weigh the interests of a small group of potential water users against those of a much larger group, but it is difficult to see how this would be possible if all water users of the state have equal rights as beneficiaries of the trust, and it would be even more difficult if, as suggested, the water users of a particular district are

the sole beneficiaries of a trust in all waters which may ever be brought into the district. Application of a trust theory, in such a situation, would be an obstacle to the development of a water plan otherwise consistent with the best interests of a majority of the people. In the absence of any specific constitutional or statutory provision establishing a trust, it is improper for this court to restrict the power of the state Legislature and the people as a whole by the device of declaring that such a trust relationship exists.

The series of cases beginning with *Merchants Nat. Bank of San Diego* v. *Escondido Irr. Dist.*, 144 Cal. 329 [77 P. 937], which are cited in support of the trust theory, are not in point because they deal not with the relationship of the state to domestic waters but rather with the functions of irrigation districts under statutes which, like section 22437 of the Water Code, specifically declared that such a district held its property "in trust" for the purposes of the district.

Nor is there anything in section 102 of the Water Code which supports the trust theory. The section reads, "All water within the State is the property of the people of the State, but the right to the use of water may be acquired by appropriation in the manner provided by law." Nothing in this language is inconsistent with the view that the state holds and can convey full and complete title to the water rights which it owns. And it is settled that the broad statement, "All water within the State is the property of the people of the State," has no application to privately owned water or water rights. (*San Bernardino* v. *Riverside*, 186 Cal. 7, 29-30 [198 P. 784].) The court in the San Bernardino case said with respect to this broad language, "Taken literally, this would include all water in the state privately owned and that pertaining to lands of the United States, as well as that owned by the state. It should not require discussion or authority to demonstrate that the state cannot in this manner take private property for public use. . . . The constitution expressly forbids it. (Art. I, § 14.) The water that pertained to or was contained in the lands of the state was already the property of the people when this [statute] was adopted. The statute was without effect on any other property." (186 Cal. 7, at pp. 29-30.)

With respect to the third method by which the United States is acquiring water rights, i.e., through purchase and exchange agreements made with private owners of riparian

rights, it is clear that under the well-recognized principles set forth above such rights are not subject to a trust.

We have been cited to no case which holds that the state or private persons cannot hold full and complete title to water or water rights, and the constitutional and statutory provisions regulating the use of water which are relied on by the majority opinion do not, even by remote implication, require or justify the application of a trust theory in this field. Under existing law water may be used only for beneficial purposes, and all property of the state is held for the benefit of the people and is subject to use and disposition only in their best interest. The application of formal trust principles in this field thus appears to be totally unwarranted. Moreover, the ramifications of the trust theory as applied by the majority are infinite, technical and unpredictable and, as pointed out above, may prove to be a handicap in the future development of the water resources of this state.

The water rights acquired by the United States must, of course, be used in accordance with federal law. Under section 8 of the Reclamation Act appropriations may be made by the federal government, not for its own use, but only for the use of landowners; the right to the use of water acquired under the act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right. (*Nebraska* v. *Wyoming* (1945), 325 U.S. 589, 614-615 [65 S.Ct. 1332, 89 L.Ed. 1815].)

The suggestion that the 160-acre limitation violates principles of equal protection and due process is without merit. This court cannot, of course, properly enter into a discussion of the wisdom of the limitation or the desirability of having it apply to the farming economy of the central valley in California. These are matters for Congress to determine. The limitation has remained in the federal reclamation law for over 50 years and has survived numerous efforts to eliminate it.[2] (Taylor, *"The Excess Land Law: Execution of a Public Policy"* (1955), 64 Yale L.J. 477, 502-503.) It seems clear that the limitation upon the amount of water from a federal irrigation project to be sold to any one landowner creates a reasonable classification in furtherance of the purposes of

---

[2] In three instances Congress specifically exempted certain reclamation projects in Colorado, Nevada and California from the limitation, but all attempts to obtain such an exemption for the Central Valley Project have failed. (Taylor, op. cit., at pp. 502-503.)

the federal legislation. The federal government does not propose to recover the entire cost of building the Central Valley Project, and its construction and operation will result in a considerable subsidy to irrigators.[3] They will have the long term use of federal money necessary to finance the construction of dams, storage and distribution systems for their benefit, free of interest, and will bear the ultimate cost of only a small part of the capital outlay allocated to irrigation construction. The water limitation was intended to prevent use of the reclamation service for speculative purposes, and it insures that the irrigators' subsidy and other benefits of federal irrigation projects will not go in disproportionate share to a few large landowners but will be confined to holders of moderate-size tracts of land sufficient to maintain one family; its purpose, in other words, is to distribute the government benefits in accordance with the greatest good for the greatest number of individuals. (Graham, op. cit., 38 Cal. L.Rev. at 617.) Any vested rights of the landowners which are taken by the federal government must, of course, be compensated for, but the problems of compensation are not within the issues of this proceeding. It should be noted in this connection that none of the landowners in the district has riparian rights or perfected appropriative rights to the waters involved here and that the land of Courtney McCracken, the individual defendant who is opposing confirmation of the contract, is located about 100 miles from the river from which such waters come.

---

[3]That portion of costs allocated to navigation and flood control (approximately 12 per cent of total estimated cost) is nonreimbursable. Of the costs for which the United States will be reimbursed, expenditures allocated to irrigation represent approximately 63 per cent of the total. Of the remainder, costs allocated to municipal and industrial water supply represent approximately 3 per cent of total reimbursable cost; that allocated to power development represents 33 per cent. (See note, 38 Cal.L.Rev. 728, 730, citing H.R. Doc. No. 146, 80th Cong., 1st Sess. 23 (1947).) Federal money expended for irrigation purposes is advanced free of interest over long periods of time, and, in the allocation of repayment obligations under plans formulated by the Bureau of Reclamation, irrigators are scheduled to repay the United States only 17 per cent of total reimbursable costs or, stated otherwise, approximately 35 per cent of the costs allocated to irrigation. (Harding, ''Background of California Water & Power Problems'' (1950), 38 Cal.L.Rev. 547, 564.) The difference is proposed to be made up by users of project power and municipal and industrial water who are scheduled to pay rates designed to return approximately 82 per cent of total reimbursable cost. (Harding, op. cit., 38 Cal.L.Rev. at 564; Graham, op. cit., 38 Cal.L.Rev. at 622; Maass, ''Administering the C.V.P.'' (1950), 38 Cal.L.Rev. 666, 672; Note, 38 Cal.L.Rev. 728, 730.)

We turn now to a consideration of the effect of the provisions in the Ivanhoe contract relating to the method by which the district irrigators shall reimburse the federal government for a part of the costs incurred in construction of the federal project. As noted earlier, the federal government proposes to recover from irrigators only a portion of the construction costs allocated to irrigation, and the federal reclamation laws now provide two methods by which the United States may recover this amount. Under section 9(d) of the Reclamation Project Act of 1939, based on provisions contained in earlier reclamation laws, an organization of irrigators and the federal government may enter into a repayment contract by the terms of which the government agrees to supply water at a rate to be fixed by the Secretary of the Interior, and the local organization agrees to repay a fixed sum representing its share of total construction costs allocated to irrigation. The Secretary fixes the sum of the organization's repayment obligation and sets the amount and number of annual installments sufficient to repay the sum within 40 years. It was found that this method lacked flexibility (see note, 38 Cal.L.Rev. 739, 740-741; Maass, op. cit., 38 Cal.L.Rev. 666, 672), and, in 1939, section 9(e) of the Reclamation Project Act created an alternative method for repayment by irrigators of the costs incurred by the federal government in constructing project units other than water distribution works located inside the district.[4] Under contracts authorized by section 9(e) there is no agreement by the irrigators to pay a definite sum within 40 years to cover costs of project construction but, instead, the

---

[4]Section 9(e) of the Reclamation Project Act provides as follows: "In lieu of entering into a repayment contract pursuant to the provisions of subsection (d) of this section to cover that part of the cost of the construction of works connected with water supply and allocated to irrigation, the Secretary, in his discretion, may enter into either short- or long-term contracts to furnish water for irrigation purposes. Each such contract shall be for such period, not to exceed forty years, and at such rates as in the Secretary's judgment will produce revenues at least sufficient to cover an appropriate share of the annual operation and maintenance cost and an appropriate share of such fixed charges as the Secretary deems proper, due consideration being given to that part of the cost of construction of works connected with water supply and allocated to irrigation; and shall require payment of said rates each year in advance of delivery of water for said year. In the event such contracts are made for furnishing water for irrigation purposes, the costs of any irrigation water distribution works constructed by the United States in connection with the new project, new division of a project, or supplemental works on a project, shall be covered by a repayment contract entered into pursuant to said subsection (d)." (53 U.S. Stat. 1193, 61 U.S. Stat. 501, 43 U.S.C.A. § 485h(e) (Supp. 1955).)

federal government, under short or long term contracts for a period not exceeding 40 years, agrees to deliver water to the local organization at a rate fixed by the Secretary which is sufficient to include some return to the federal government on construction costs as well as costs of operation and maintenance.

In the present contract, costs incurred by the federal government in constructing a water distributing system *inside* the Ivanhoe district are covered by a 9(d) type provision. The contract does not contain any express provision for repayment of a share of the costs of constructing portions of the project located *outside* the district, such as Friant Dam and other units of the Central Valley Project. It provides merely that the United States is to furnish water and the district is to pay for it at an acre-foot rate to be fixed annually by the Secretary, in no event in excess of $3.50 per acre foot. It is argued that the contract is defective because there is no specific requirement that a definite portion of that rate shall be allocated to repayment of the district's share of the costs of constructing project facilities outside the district. However, the applicable provisions of section 9(e) must be read into the contract, and they provide that the water rate fixed by the Secretary shall be such as will produce revenue sufficient to cover an appropriate share of annual operation and maintenance costs ''and an appropriate share of such fixed charges as the Secretary deems proper, due consideration being given to that part of the cost of construction of works connected with water supply and allocated to irrigation.''

It is obvious under section 9(e) that the water rate to be fixed by the Secretary under the Ivanhoe contract is to include a construction component and that revenue produced in excess of operation and maintenance costs is to be treated as repayment by the district of its share of construction costs, and it is immaterial that the contract does not specifically so direct. Any question as to this interpretation of section 9(e) must now be regarded as settled by a recent statute providing, among other things, that in administering sections 9(d) and 9(e), the Secretary of the Interior shall ''credit each year to every party which has entered into or which shall enter into a long-term contract pursuant to said subsection (e) so much of the amount paid by said party on or before the due date as is in excess of the share of the operation and maintenance costs of the project which the Secretary finds is properly chargeable to

that party. Credit for payments heretofore made under any such contract shall be established by the Secretary as soon after the enactment of this Act as it is feasible for him to do so. After the sum of such credits is equal to the amount which would have been [sic] for repayment by the party if a repayment contract under subsection (d) had been entered into, which amount shall be established by the Secretary upon completion of the project concerned or as far in advance thereof as is feasible, no construction component shall be included in any charges made for the furnishing of water to the contracting party and any charges theretofore fixed by contract or otherwise shall be reduced accordingly." (Pub. L. No. 643, 84th Cong., 2d Sess. § 1(3) (July 2, 1956), 70 U.S. Stat. 483-484 (1956).)

It has been suggested that the 9(e) type of contract places the federal government in the role of a utility, a mere seller of water, and that district irrigators can never acquire permanent, appurtenant water rights thereunder. Such reasoning, however, overlooks the clear declaration which has appeared in the reclamation law since its enactment in 1902 that "the right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, . . ." (32 U.S. Stat. 390, 43 U.S.C.A. § 372.) It is not reasonable to suppose that anything in the provisions of section 9(e) has in any way altered this basic purpose of the reclamation law. (*Cf. Nebraska* v. *Wyoming,* 325 U.S. 589, 614-615 [65 S.Ct. 1332, 89 L.Ed. 1815].) Moreover, it is now expressly directed that the Secretary of the Interior, in administering sections 9(d) and 9(e), shall provide that the other party to any contract entered into pursuant to those sections "shall, during the term of the contract and of any renewal thereof and subject to fulfillment of all obligations thereunder, have a first right . . . to a stated share or quantity of the project's available water supply . . . and a permanent right to such share or quantity upon completion of payment of the amount assigned for ultimate return by the party, subject to payment of an appropriate share of such costs, if any, as may thereafter be incurred by the United States in its operation and maintenance of the project works." The Secretary is expressly authorized to amend existing 9(e) contracts to make their language conform to this act. (Pub. L. No. 643, 84th Cong., 2d Sess. §§ 1(4), 2 (July 2, 1956), 70 U.S. Stat. 483-484.)

It has also been urged that neither section 9(e) nor the

Ivanhoe contract contains a provision authorizing renewal of the water delivery provisions beyond 40 years and that the federal government is, therefore, under no obligation to continue to supply water beyond the 40-year period. The Department of the Interior has construed the reclamation law to mean that construction costs allocated to irrigation may be recovered by means of 9(e) contracts in any reasonable period within the useful life of the project, and the rates presently established for the Central Valley Project are calculated to effect full recovery of the costs of the major units by the year 2009. There is nothing in section 9(e) which requires the recovery of all construction costs within 40 years or which forbids the renewal of water delivery contracts for periods beyond that time. This interpretation must be regarded as settled by the provision recently added to the reclamation law which authorizes the Secretary, if requested by the other party thereto, to amend existing contracts entered into under section 9(e) to include a provision for renewal. The Secretary is also authorized, upon request, to amend existing 9(e) contracts to include a provision contemplating conversion of the 9(e) contract into a 9(d) type repayment contract at a time in the future when the amount remaining due the United States by the other party is so small that it can probably be discharged in annual installments within the period fixed by law for 9(d) contracts, i.e., at present, 40 years. (Pub. L. No. 643, 84th Cong., 2d Sess. §§ 1(1), 1(2), 2 (July 2, 1956), 70 U.S. Stat. 483-484.)

There is no merit in the argument that the contract is defective because it fails to state that, upon repayment of all construction costs, the district shall succeed to whatever title the United States has acquired to property in the district in connection with the project. The contract provides that "Title to all of the Project works, including the distribution system constructed by the United States pursuant to this contract, shall be and remain in the name of the United States until otherwise provided for by the Congress, notwithstanding the transfer hereafter of any such works to the District for operation and maintenance." This provision is required by the reclamation law. (32 U.S. Stat. 389, 43 U.S.C.A. § 498.) There is no reason why the parties cannot agree that title to the project works shall remain in the United States after repayment of construction costs. The provision is a reasonable method of assuring that the

various properties of the project shall remain devoted to the purposes for which the federal funds were expended, and, in the absence of a showing that the provision violates the Constitution, or a statute or some rule of policy, we should not hold it to be invalid. There is nothing in the contract or in the reclamation law which precludes Congress from transferring title to project property to the district after all terms of the contract are performed, and it will be up to the district to press its claim thereto at such a time. It is not the business of the courts to determine whether the contract provision is a wise one from the standpoint of the district; the question is one of validity.

The conclusions expressed above make it unnecessary to consider whether the Second Validating Act of 1949 (Stats. 1949, p. 1511) is applicable to the contract.

I would reverse the judgment.

Traynor, J., concurred.

CARTER, J.—I dissent.

The majority opinion is based upon at least two fundamental misconceptions of law. First, this case does not involve water rights in the ordinary sense. That is, it does not involve questions relating to the right to divert and use water from a stream or other source; questions of priority or riparian ownership or beneficial use of water as defined in our statutes and court decisions. It involves the validity of a contract between the government of the United States and an irrigation district organized and existing under the laws of this state.

Second, even if the law relating to water rights were involved, the theory enunciated in the majority opinion of title to all domestic water being held in trust by the state is fundamentally unsound and unsupported in law, tradition, history, public policy, practice or human experience.

A brief statement relative to the origin and development of the Central Valley Project and its objectives will demonstrate that the contract here involved was entered into in accordance with federal and state law and is therefore valid.

The Central Valley Project was originally authorized by the State of California for construction by its Water Project Authority under the Central Valley Project Act of 1933 (Cal. Stats. 1933, § 1042, p. 2643, effective after referendum action, January 13, 1934, now Wat. Code, § 11100 et seq.). No action

was taken by the Water Project Authority for the construction of this project, but on September 10, 1935, President Roosevelt, by executive order, transferred $20,000,000 under the Federal Emergency Relief Appropriation Act of 1935 to the Department of the Interior, Reclamation Service, for construction of Friant Dam on the San Joaquin River. The project was thereafter constructed as a reclamation project pursuant to the Reclamation Act above referred to and acts amendatory thereto. There is no question but that the United States government complied with all of the provisions of the law of California in the acquisition of the water rights incident to this project and that the construction, operation and maintenance of the storage dams and facilities are in every respect in accordance with the laws of this state. It is likewise clear that this project was constructed in accordance with the laws of the United States and that the authority exercised by the Reclamation Service in storing and distributing the water developed by said project is strictly in accord with both the laws of the United States and of the State of California. Such being the case, we must look to these laws to determine whether or not the state agency involved in this case had the authority to enter into a contract with the United States government for the purchase of the water developed by said project. There is no question but that both the federal and state laws authorize the execution of such contracts. So far as our state law is concerned, the contract here involved is expressly authorized by the Irrigation District Federal Cooperation Law (Wat. Code, § 23175 et seq.) of this state which authorizes a state agency to contract with the United States for a water supply (Wat. Code, § 23196a), and to deliver, distribute, and apportion this supply as required by federal law (Wat. Code, §§ 23197a, 23200).

The contract here involved is also expressly authorized by the federal laws relating to the reclamation of arid lands of the west, and particularly by section 9(e) of the Reclamation Project Act of 1939 (33 Stats. 1939, p. 1196, 43 U.S.C., § 485h(e) 1946 F.R.L.A. 600), and section 46 of the Omnibus Adjustment Act of 1926 (46 Stats. of 1926, p. 649, 43 U.S.C., § 423e 1946 F.R.L.A. 318). These laws, in themselves, and in conjunction with the state laws do not deprive anyone of property without due process of law, nor deny to anyone equal protection of the laws, and do not derogate from the powers reserved to the state under the Tenth Amendment to the Constitution of the United States.

There is no provision of law in this state which imposes any restriction against an agency of this state from entering into a contract with the United States involving the subject matter of the contract here under consideraion. The 160-acre limitation for the use of water from a reclamation project has been in existence since 1902 and this provision has never been successfully assailed as impinging any constitutional right of anyone who has been called upon to comply with the provisions of the Reclamation Act.

We are not here concerned with the social and economic philosophy which was the background of the inclusion of the 160-acre limitation in the Reclamation Act. It is not our province to declare whether this provision of law is good or bad. It was adopted by Congress after many years of debate, and although numerous assaults have been made against it, Congress has not only refused to delete it from the act but has on two occasions, once in 1926 and again in 1939, expressly reaffirmed their belief in the wisdom of this provision. Neither has the Legislature of California seen fit to disapprove the inclusion of this provision in the contracts which it has authorized state agencies to negotiate with the United States government for the distribution of water from reclamation projects. The fact that in the case here involved the inhabitants of the district which negotiated the contract containing the 160-acre limitation, voted overwhelmingly in favor of said contract, should be persuasive evidence that the provision is not detrimental to the social and economic welfare of the people affected by it.

With respect to the title to the unappropriated waters of this state, the statutes of this state declare that "The sovereignty of the State resides in the people thereof. . . ." (Gov. Code, § 100), and that "All property within the limits of the State, which does not belong to any person, belongs to the people" (Gov. Code, § 182). Since the power of sovereignty is vested in the people, and all property within the limits of the state, which does not belong to any person, belongs to the people, it follows that the unappropriated waters of the state are owned by the people under their power of sovereignty. The people have, through the Constitution, delegated this power to the executive and legislative branches of the government. The Legislature of this state has provided by law a comprehensive system for the appropriation, distribution and use of the waters of this state, including the

impounding and storage of the seasonal run-off for distribution and use for beneficial purposes. I refer to the Water Code of this state adopted by the Legislature in 1943 which contains the following provisions (among others) with respect to the ownership, appropriation and use of the domestic waters of this state:

"102. All water within the State is the property of the people of the State, but the right to the use of water may be acquired by appropriation in the manner provided by law.

"103. In the enactment of this code the Legislature does not intend thereby to effect any change in the law relating to water rights.

"104. It is hereby declared that the people of the State have a paramount interest in the use of all the water of the State and that the State shall determine what water of the State, surface and underground, can be converted to public use or controlled for public protection.

"105. It is hereby declared that the protection of the public interest in the development of the water resources of the State is of vital concern to the people of the State and that the State shall determine in what way the water of the State, both surface and underground, should be developed for the greatest public benefit.

"106. It is hereby declared to be the established policy of this State that the use of water for domestic purposes is the highest use of water and that the next highest use is for irrigation." (Wat. Code, §§ 102, 103, 104, 105, and 106.)

In the adoption of the state Water Code, the Legislature has made it abundantly clear that anyone complying with the laws of this state may be granted a right to appropriate and use any unappropriated water which he can put to a beneficial use. The government of the United States, acting under valid acts of Congress, may become an appropriator of any of the unappropriated waters of this state the same as any other public or private corporation or individual who complies with the law of this state governing the appropriation and use of such waters.

After reviewing the history of the water law of California the majority opinion states: "It is therefore concluded that the title to the unappropriated waters of the state is in the State of California in trust for the use and benefit of the beneficiaries of that trust; that the trust character of that title is anchored in the state by constitutional provisions, by statutes enacted in furtherance thereof, and by the decisional

law of the state. . . ." The majority opinion does not cite any constitutional or statutory provision or any decision of any court of this state which supports the foregoing statement. On the contrary there is not a single constitutional or statutory provision or decision of any court of this state from which it is possible to draw such conclusion. The words trust or trustee or trust relationship do not appear in any constitutional or statutory provision or any court decision of this state dealing with the title or ownership of water by the State of California.

The reasoning of the majority with respect to the right of the beneficiaries under the so-called trust to the beneficial use of water seems incoherent. It proceeds from the premise ". . . that the title to the unappropriated domestic waters of the state is in the State of California in trust for the use and benefit of the beneficiaries of that trust;... that the beneficiaries of that trust are the water users of the state who in a general sense *constitute all of the people of the state*; that the beneficiaries of the trust relationship whose rights are here under consideration are *those present or prospective users* who individually or in properly classified groups bring themselves within the orbit of the state law under which they may be in position to demand benefits without discrimination, and that within that category are the landowners of the district." (Emphasis added.)

Under the foregoing line of reasoning no vested right may ever be acquired by any individual or group of individuals to appropriate and use a given quantity of water for a beneficial purpose even though they have complied with all the provisions of the statutory law of this state, as the state would have no power to grant a specific right to any individual unless every other individual who may have a use for water has received his share. The following practical example may demonstrate the absurdity of the reasoning of the majority. It is a matter of common knowledge that there are vast areas of land in this state which have no available water supply. Under existing law, however, an individual or group of individuals may acquire a right to develop a water supply from unappropriated waters (see Wat. Code, §§ 1252, 1252.5, 1253, 1350, 1375, 1380, 1390, 1450, 1455) by pumping from wells or storage of run-off which may be adequate to supply the limited areas owned by those who develop such supply. However, there may be other areas in the same locality for which no water is available because of the prior appropriation and

development of the supply made available to those who first obtained a permit and proceeded with the installation of facilities for the appropriation and use of the entire available supply. It is obvious that under the trust theory advanced in the majority opinion, the state could not grant a right to one user which would deprive another of his share even though the first appropriator was devoting all of the available water to a beneficial use on his land. In this connection the majority opinion states, "The trust relationship existing between the state and the beneficiaries of the trust must therefore be kept in mind in connection with any transactions between the state or any of its agencies and outside parties. It follows that when an outside party, such as the United States, by contract, legislation or otherwise, steps into the shoes of the state to administer that trust by the development, conservation and distribution of the trust res, it is bound by the same rules of law as surround and govern the State of California or any other purveyor of water of the state for the benefit of its water users. *The state may not therefore lawfully dispossess itself of the title to such water and may not surrender its control of the same in any way inconsistent with the administration of the trust under which the title is held. The state by general law may and has in the main prescribed the terms and conditions under which the several classes of water users may become secure in their right to the water and use thereof.*" (Emphasis added.) But the state has not classified water users nor prescribed the terms and conditions under which they may become secure in their right to the water and use thereof on any theory of trust relationship between it and the users. On the other hand the state has provided that an individual or group of individuals may obtain a permit to appropriate and use a specific quantity of water, and to the extent that such appropriation is prior in time, it is prior in right to other appropriations and constitutes a vested right protected by the due process clauses of both the state and federal Constitutions. (See Wat. Code, §§ 1450, 1455; *Temescal Water Co.* v. *Department of Public Works*, 44 Cal.2d 90 [280 P.2d 1].) In this connection, the Water Code provides (see Wat. Code, § 1252.5) that the government of the United States may acquire a water right by appropriation in the same manner as any individual or corporation. The foregoing provisions of the Water Code are in clear conflict with the so-called trust theory advanced in the majority opinion. It should be

perfectly obvious that the provisions of the Water Code above cited which confer a vested right upon appropriators of water, including the United States, cannot stand in the face of the holding of the majority here that the state holds the title to all the unappropriated domestic waters of the state in trust for all of the water users of the state, as it cannot be denied that the effect of the provisions of the Water Code which authorize the granting of permits for the appropriation and use of the unappropriated waters of the state by individuals and private and public corporations, including the United States, is to deprive some of the beneficiaries of the trust of their share of the trust res—water—by the first come, first served policy with respect to the appropriation of the unappropriated domestic waters of the state as declared in the Water Code. The majority opinion expressly states that "The state may not therefore lawfully dispossess itself of the title to such water [unappropriated domestic water] and may not surrender its control of the same in any way inconsistent with the administration of the trust under which the title is held." The inevitable conclusion which must be reached from the reasoning of the majority opinion is that all unappropriated domestic waters of the state are held in trust for the use of all of the people of the state who are in a position to put their respective shares of the water to a beneficial use and that such beneficiaries have the right to demand and receive their respective shares of such water as beneficiaries of said trust. In this connection the majority states "It is they who are in a position to avail themselves of the right to beneficial use of the waters to be purveyed and to demand indiscriminate service."

It must be remembered that there is no provision in either the state or federal law which purports to allocate any portion of the water developed by the Central Valley Project to the plaintiff in this action or to any other agency, group or individual. The allocation and distribution of said water is a matter to be provided for by contract entered into pursuant to the provisions of the federal and state laws on this subject. After reviewing its trust relationship theory the majority opinion states "There is nothing in the foregoing declaration [trust relationship between state and present or prospective water users] which interjects anything new into the water law of this state. It is but a recognition and redeclaration of existing fundamental concepts of this phase of our law."

If the majority is aware of any prior declaration of this

or any other court of this state invoking the trust relationship concept to state-owned water rights it has failed to disclose the source or location of such declaration. While it may not be new to the majority, it is both new and novel to me and is basically unsound.

The only authorities upon which the majority rely for the so-called trust relationship are the following: *Merchants Nat. Bank* v. *Escondido Irr. Dist.*, 144 Cal. 329 [77 P. 937]; *Tulare Irr. Dist.* v. *Collins*, 154 Cal. 440 [97 P. 1124]; *Hall* v. *Superior Court*, 198 Cal. 373 [245 P. 814]; *Lindsay-Strathmore Irr. Dist.* v. *Wutchumna W. Co.*, 111 Cal.App. 688 [296 P. 933]; *Allen* v. *Hussey*, 101 Cal.App.2d 457 [225 P. 674]. None of these cases even mentions the question of title or ownership of the unappropriated domestic waters of the State of California. They deal exclusively with the rights of landowners within irrigation districts to receive their respective proportions of the water which the irrigation district has acquired for the use and benefit of the lands within the district. It is obvious that in administering the distribution of water to landowners within an irrigation district, the district is acting as a trustee and the landowner a beneficiary, as the landowner supplies the funds which enable the district to acquire and distribute the water, and the district should be required to distribute available water to landowners on a fair and equitable basis so that there will be no discrimination between them. It is clear that the landowner within an irrigation district has no property right in any particular quantity of water, as the title to the water is vested in the irrigation district which is required to distribute it to the landowners in accordance with the latters' needs. The situation with respect to the ownership of unappropriated domestic water by the state is entirely different. The state does not undertake to distribute any particular quantity of water to anyone. It has established an agency (the Division of Water Resources) to determine the quantity of water available and to grant permits for the use of such water to those making application therefor in accordance with the law. There is no provision of law requiring the Division of Water Resources to supervise the distribution of water covered by permits issued by said division, and if the right of the permittee is violated by a third person, he must resort to the courts for the enforcement of his right. The Water Code makes it crystal clear that anyone complying with its provisions may acquire the right to use

water by appropriation in the manner provided by law. (See Wat. Code, § 102.) The right so acquired is a property right and protected by the due process clauses of both the state and federal Constitutions.

The concept of the trust character of title to the domestic waters of this state being vested in the State of California as enunciated in the majority opinion is clearly out of harmony not only with the Constitution and statutes of this state but with the decisional law as well. This is demonstrated by the discussion in the majority opinion relative to the development of the law relating to water rights in this state. At the beginning of this discussion the majority opinion refers to the case of *Lux* v. *Haggin* decided by this court in 1886 (69 Cal. 255). Referring to the holding of this court in *Lux* v. *Haggin, supra,* the majority states: "The doctrine was declared to be that the owner of real property bordering such a river or stream had a right co-existent with the same rights of other landowners on the stream, to the use of its waters and the flow thereof as it was 'wont to do in the course of nature' unimpaired in quality and undiminished in quantity. This right was declared by this court in *Lux* v. *Haggin, supra,* 69 Cal. 255, to be a right appurtenant to the land, in fact a part and parcel of the land itself. Under this doctrine the riparian owner had the right to insist that the full flow of the stream continue to pass his land in its natural state whether he needed the water or not. This riparian right as so defined was declared by this court to be a property right which vested in the riparian owner and as such was protected by the state and federal Constitutions. It could not be limited or impaired without due process of law and without just compensation." It is conceded by the majority that the rule announced in *Lux* v. *Haggin, supra,* continued to be the rule of decision in this state until 1933 when this court was persuaded by opinions prepared by the facile pen of Mr. Justice Shenk (see *Gin S. Chow* v. *City of Santa Barbara,* 217 Cal. 673 [22 P.2d 5]; *Peabody* v. *City of Vallejo,* 2 Cal.2d 351 [40 P.2d 486]) to hold that this doctrine was no longer applicable and was supplanted by the doctrine of reasonable use even as against appropriators. It should be noted that the theory of the trust character of title to water rights had not then been conceived by Mr. Justice Shenk as no mention was made of this theory until now. It would seem, however, that if the state ever held the title to the domestic waters of this state

in trust, it did so from the beginning; that is, from the time the state was admitted into the union and became an entity capable of exercising ownership and possession of property. The majority here do not claim that this trust theory of title to water rights originated with the adoption of the Water Commission Act in 1913 or the adoption of the amendment to the Constitution in 1928 (Cal. Const., art. XIV, § 3) or with the sweeping pronouncements contained in the decisions of this court in the Gin Chow and Peabody cases. This theory must have originated and come into being when the Constitution of 1849 was adopted and existed at the time this court decided *Lux* v. *Haggin, supra,* in 1886, and during all of the intervening years when this court was applying the doctrine announced in *Lux* v. *Haggin.* Such being the case, can it be said that the doctrine of *Lux* v. *Haggin* and all of the other decisions of this court in water rights cases between 1886 and the decision of the Gin Chow case in 1933 is compatible with the theory that the State of California held the title to the domestic waters of the state in trust for water users who are said to be the beneficiaries of the so-called trust. The answer is obvious. The declaration of the riparian right doctrine in *Lux* v. *Haggin, supra,* is clearly repugnant to any trust concept. Under this doctrine the riparian owner got title to the riparian right when a patent was issued to him for his riparian land whether that patent came from the state or federal government. Under this doctrine the right to have the full flow of the stream past his land unimpaired in quality and undiminished in quantity except by the reasonable use of another riparian owner, was a vested right, a part and parcel of the land itself and protected by the due process clauses of both the state and federal Constitutions. (*Miller & Lux* v. *Madera Canal etc. Co.,* 155 Cal. 59 [99 P. 502, 22 L.R.A.N.S. 391].) While the majority opinion does not purport to express or declare what was the genesis of the so-called trust title theory, there are declarations in said opinion from which an inference might be drawn that the Water Commission Act plus the 1928 constitutional amendment plus the doctrine announced in the Gin Chow and Peabody cases gave rise to such theory. After discussing the effect of the foregoing the majority opinion states: "It is thus apparent that the more recent changes in the constitutional and decisional law of this state had the effect of making available for beneficial uses by appropriation and other means great

volumes of unappropriated waters of the state.'' I have difficulty attempting to rationalize the foregoing statement. If the state ever had title to the waters referred to, it never lost it. If it did not have title to said waters, the title must have been vested in others. If it was vested in others, the only manner in which it could acquire title thereto was by purchase or the exercise of its power of eminent domain unless the users voluntarily abandoned the waters and made them available for appropriation and use by others. Certainly, the Legislature could not by statute nor the people by the adoption of a constitutional amendment nor could this court by a valid rule of decision divest an owner of a valid title to a water right any more than any of those departments of government could validly divest an owner of private property of his title to lands or personal belongings. What really happened in this melee of incongruity is that this court saw fit to change the riparian right doctrine from that announced in *Lux* v. *Haggin, supra,* to the so-called reasonable use doctrine as announced in the Gin Chow and Peabody cases by holding that the *Lux* v. *Haggin* doctrine had become outmoded and was not adapted to the arid conditions existing in this state. What this court did in the said last mentioned decisions had the effect of overruling all of the former decisions of this court from *Lux* v. *Haggin* in 1886 to *Herminghaus* v. *Southern Calif. Edison Co.*, 200 Cal. 81 [252 P. 607], decided in 1926, as it is obvious that said rule could not be changed without overruling said cases which had held that the riparian right doctrine as announced in *Lux* v. *Haggin* was a vested property right protected by the due process clauses of both the federal and state Constitutions. What Mr. Justice Shenk did in the Peabody and Gin Chow cases was simply to ignore the holding of this court in *Miller & Lux* v. *Madera Canal etc. Co.*, 155 Cal. 59 [99 P. 502], by holding that the doctrine of reasonable use even as against an appropriator did not violate the due process clauses of the federal and state Constitutions. I have heretofore stated that I would have arrived at the same conclusion by forthrightly overruling all of the decisions of this court applying the *Lux* v. *Haggin* doctrine as being unsound in principle and based upon a misapprehension of the law applicable to water rights (see dissenting opinion in *City of Pasadena* v. *City of Alhambra,* 33 Cal.2d 908, at p. 938 [207 P.2d 17]).

The majority opinion correctly states that the decision of this court in *Lux* v. *Haggin, supra,* was based upon the declaration contained in section 4468 of the Political Code which provided at that time as follows: "The common law of England, so far as it is not repugnant to or inconsistent with the Constitution of the United States, or the Constitution or laws of the State of California, shall be the rule of decision in all the courts of this state." But the majority opinion is in error when it states: "This court took the general language of that declaration by its four corners and applied the English common law doctrine of riparian rights to the ownership, control and use of the waters of the rivers and streams of the state." While it is true that the majority of this court in its opinion in *Lux* v. *Haggin, supra,* assumed that the riparian right doctrine as there declared was based upon the common law of England, such assumption was erroneous and without foundation in fact or law as there now appears to be no doubt that the riparian right doctrine was not a part of the common law of England but a part of the civil law and the first reference to it is contained in the Code Napoleon, the French Civil Code, in the year 1804. The first decision announcing the riparian right doctrine in any common law country was the case of *Tyler* v. *Wilkinson,* 4 Mason 397 [F. Cas. No. 14312], which was written by Mr. Justice Story of the Supreme Court of the United States while sitting as a circuit judge in the Rhode Island circuit in the June term of 1827. The first case involving the riparian right doctrine in England was decided in 1849 and referred to *Tyler* v. *Wilkinson* as its authority. My authority for the foregoing statement is an article written by Mr. Samuel C. Wiel of the California Bar, an eminent authority on water law, author of the text "Water Law in the Western States" and various other publications on water law. This article was published in the Harvard Law Review, Volume XXXIII, Number 2, in 1920.

The fallacy underlying the basis for the decision of this court in *Lux* v. *Haggin, supra,* has permeated numerous decisions of this court and is no doubt the reason for much of the confusion which has been brought about as the result of the judicial fumbling and bungling of the water laws of this state (see dissenting opinion in *City of Pasadena* v. *City of Alhambra,* 33 Cal.2d 908, at 938 [207 P.2d 17]).

Returning to the so-called trust title theory of water rights, the majority opinion does not purport to delineate the terms

of the so-called trust. But in view of the position taken by the majority that the domestic waters, the title to which is held in trust by the state, must be administered in accordance with the statutory and decisional law of the state, we may assume that such law may be resorted to for the purpose of ascertaining the terms of the trust. If such is the case, it would seem that the terms of such trust may be changed at every session of the Legislature or during every period that a new group of justices constitutes a majority of the Supreme Court of this state. In other words this so-called trust character of the title to the domestic waters of this state, has no stability whatsoever and may be changed from decade to decade or from year to year as may be dictated by the political fortunes of those who declare and administer it.

The record in this case discloses that in the construction and operation of the units of the Central Valley Project the United States through its Bureau of Reclamation has acquired by purchase and the exercise of the power of eminent domain vast areas of privately owned lands and numerous water rights some of which were based upon filings of applications for the appropriation of unappropriated waters by the State of California and various agencies of the state such as irrigation districts and municipal water districts and also from many private individuals and corporations which claimed to own vested rights in the domestic waters of this state both as appropriators and riparian owners. Included among the agencies from which such rights were acquired by the United States are Madera Irrigation District, Tranquility Irrigation District, James Irrigation District, and the following private or quasi-public corporations: Miller and Lux, Inc., Gravelly Ford Canal Company, Kings River Canal and Irrigation Company, Columbia Canal Company, San Luis Canal Company, Firebaugh Canal Company, Gerlach Live Stock Company, Hollister Land and Canal Company, Chowchilla Farms, Inc., Edison Securities Company and many other corporations and individuals. While the consideration paid by the United States for the rights acquired from the above public agencies, corporations and individuals is not disclosed, it appears, that the sum of $2,450,000 was paid to Miller and Lux, Inc., for title to all of the waters of the San Joaquin River in excess of flows specified in schedules attached to the agreement of purchase (see Report Prepared Pursuant to Senate Concurrent Reso-

lution Number 48, Legislature of 1951, introduced in evidence as Water Project Authority's Exhibit N.)

If the majority is right in holding that the title in all of the water rights acquired by the United States in connection with the construction, development and operation of the Central Valley Project is held in trust for the water users of this state, such holding must be based upon the premise that all of the rights so acquired were held in trust by the owners of such rights who conveyed the same to the United States. This would apply to the vast riparian right holdings of Miller and Lux, Inc., which were adjudicated by numerous decisions of this court as being a part and parcel of the lands of said corporation, title to which was vouchsafed by the due process clauses of both the federal and state Constitutions.

While there can be no question that the Supreme Court of the United States has held in many cases that the matter of ownership, distribution and use of water, with few limited exceptions, is within the jurisdiction of the state and the determination of the right to appropriate and use water is controlled by state law (*Kansas* v. *Colorado,* 206 U.S. 46, 93-94 [27 S.Ct. 655, 51 L.Ed. 956] ; *United States* v. *Arizona,* 295 U.S. 174 [55 S.Ct. 666, 79 L.Ed. 1371] ; *United States* v. *Gerlach Live Stock Co.,* 339 U.S. 725 [70 S.Ct. 955, 94 L.Ed. 1231] ), recent decisions of that court make it clear that there are certain fields in which the federal law prevails over the state and that the state's control of the waters within the state is not complete and unqualified (see *United States* v. *San Francisco,* 310 U.S. 16 [60 S.Ct. 749, 84 L.Ed. 1050] ; *First Iowa Hydro-Electric Coop.* v. *Federal Power Com.,* 328 U.S. 152 [66 S.Ct. 906, 90 L.Ed. 1143] ; *Henry Ford & Son* v. *Little Falls Fibre Co.,* 280 U.S. 369 [50 S.Ct. 140, 74 L.Ed. 483] ; *Federal Power Com.* v. *Niagara Mohawk Power Corp.,* 347 U.S. 239 [74 S.Ct. 487, 98 L.Ed. 666] ; *Federal Power Com.* v. *State of Oregon,* 349 U.S. 435 [75 S.Ct. 832, 99 L.Ed. 1215] ; *State of Wash. Dept. of Game* v. *Federal Power Com.,* 207 F.2d 391; *Alabama Power Co.* v. *Gulf Power Co.,* 283 F. 606 ; *California Oregon Power Co.* v. *Superior Court,* 45 Cal.2d 858 [291 P.2d 455] ). It seems clear, however, that in the construction and operation of the units of the Central Valley Project the United States proceeded under the provisions of the Reclamation Act (43 U.S.C., § 731 et seq.) and with full recognition of the water rights there involved having valid

existence under state law (*United States* v. *Gerlach Live Stock Co.*, 339 U.S. 725 [70 S.Ct. 955, 94 L.Ed. 1231]).

It is a matter of common knowledge that there are thousands, probably millions of acres of land in California which are still in government ownership and vast water resources exist in these regions. As I read the recent decisions of the Supreme Court of the United States, I have little doubt that under the rules of law announced therein, the federal government may lawfully exercise exclusive control over the water resources which exist on lands and in areas owned and controlled by it. I refer to the national forests and the undeveloped areas of this state which remain almost exclusively in government ownership and control.

We may take judicial notice that the federal government is now engaged in the construction of another large reclamation project which will be annexed to and contribute to the water resources of the Central Valley Project. I refer to the Trinity River Project which contemplates the construction of a dam 465 feet high on the Trinity River near Weaverville in Trinity County, which will impound the run-off of the Trinity River watershed and will have a capacity of approximately 2,500,000 acre feet of storage. More than 75 per cent of the 450,000 acres of land embraced within this project is owned by the United States government. When this dam is completed and the water therefrom discharged into the Sacramento River basin, the United States government will no doubt proceed to dispose of it in accordance with the laws of the United States including the 160-acre limitation in the Reclamation Act. It does not seem reasonable and logical to me that this court should say to the government of the United States that you cannot impound the waters of the Trinity River basin which are now running to waste and causing immeasurable flood damage, and divert it into areas where it may be used for the irrigation and improvement of arid lands and other useful purposes unless you eliminate from your contracts for the distribution of this water the 160-acre limitation which the Congress of the United States has said must be included in such contracts. Yet, this requirement must flow from the holding of the majority here even though the water made available by said project is produced from a drainage basin, 75 per cent of the area of which is owned by the United States.

It is my view that when the United States constructs a reclamation project by impounding water in compliance with

both state and federal laws, it is the owner of that water and may dispose of it as provided by federal law, and it may exact any condition which the federal law sees fit to provide for in connection with the sale and distribution of that water. Of course this does not mean that Congress could impose restrictions in conflict with constitutional principles. It may be that the State of California by legislative action could so restrict the appropriation of its water resources that the federal government would not see fit to develop further reclamation projects in this state, but so long as the federal government complies with the law of the State of California in the construction, operation and maintenance of its reclamation projects, I am disposed to hold that it may sell and distribute the water developed by said projects under contracts of the type here involved which, in my opinion, do not violate any provision of the Constitution and laws of this state or the Constitution and laws of the United States.

We have here no controversy between the State of California and the United States. The attorney general of California takes the position that the contracts here involved are valid. The agencies here involved have all accepted and approved these contracts both by their governing boards and the inhabitants of the districts affected thereby. The validity of these contracts is challenged only by individuals who claim that their property rights will be affected thereby. I do not agree.

At the outset of this opinion I stated that the majority opinion is based upon two fundamental misconceptions. I then called attention to the fact that the majority opinion is written upon the assumption that this is a case involving water rights and that the State of California holds title to all of the domestic waters of the state in trust. I think it proper to add another fundamental misconception on which the majority opinion is based; that is, that the so-called 160-acre limitation is in effect an excess land law. With this concept I do not agree. In an excellent article by Professor Paul S. Taylor, Professor of Economics, University of California, printed in the Yale Law Journal, Volume 64, Number 4, February, 1955, entitled *"The Excess Land Law: Execution of a Public Policy,"* he states in part:

"A great confusion pervades discussion of the excess land law and threatens disaster to public policy regarding disposing of public domain. Congress has declared this policy

to be the widespread distribution of benefits, and the curbing of monopoly and speculation, whether the domain is in form of land, water, or both. The excess land provision of the National Reclamation Act of 1902 is a means of attaining these ends in the public disposal of water.

"General and legal acceptance have joined to confer authority upon either of two descriptive titles—'excess land law' or '160-acre limitation'—both of them equally deceptive. The law is not really a *land* law, and it places no limitation whatsoever upon the *acreage* a man may own. The restraint is neither upon acreage of land nor upon water, but upon the *individual*. No individual is entitled to receive more than an equitable share of the water distributed under reclamation law. The maximum *individual* share is set at an amount of water necessary to irrigate 160 acres of land.

"Among the sources of this confusion of language, two are 'accidents'—one physical, the other historical. The first is the unequal geographical distribution of water. Water and land are two halves of a productive whole everywhere. East of the one hundredth meridian nature has joined them, and any description or analysis of agricultural land can assume water. West of the hundredth meridian water and land are separate. Man-made works—reservoirs and canals—are required to join them. Water and land, therefore, must be treated separately, whether as physical entities, objects of private ownership, or the concern of public policy. Water cannot be assumed as the natural, inevitable and permanent adjunct of land. *Land* ownership does not equal *water* owner-ship west of the hundredth meridian.

"The second source of confusion is an historical accident. Policy was debated and formulated in the nineteenth century when settlement was still east of the hundredth meridian, and water was not a concern. The great legislative land-marks in the nation's policy favoring actual settlers are land laws—the Pre-emption Act of 1841 and the Homestead Act of 1862. After these acts were passed, settlement crossed the hundredth meridian, and water became the primary concern. General policy was not altered with the movement to the arid belt, but the techniques and devices for implementing it had to change. The artificial union of land and water required more complex thought and language than was necessary where land and water are joined naturally. The means of applying public policy to water had to be de-

clared separately, spelled out in new terms. Chief among the new techniques was the excess land law.

"It took something of a mental wrench to turn American lawmakers and administrators from land policy to water policy. The natural tendency was to carry over the language of earlier land problems to the more complex problems of water. A result of this inertia has been confusion in thought as well as in language west of the hundredth meridian, where thinking in terms of land policy overemphasizes land and underemphasizes water. Some persons have found it advantageous to exploit the confusion. Those who achieved what Major Powell called 'monopoly of land' utilize this habit of thinking in terms of *land* policy to confuse the public, to suggest that private landowners have a moral claim to water in proportion to their landholdings whatever their size, and to defeat the efforts of legislators who seek equitable distribution of water among individuals. Even administrators do not find it easy to remember that the essential question is not, who owns the land, but who gets the water.

"The fact of importance above all others in federal reclamation is that the landowner calls upon the government to provide him with water. It is for Congress representing the general interest, and not for the landowner, to say upon what terms, in what amount, and in accord with what policy the public will supply water. This is a first principle inherent in a relationship between the public that gives and an individual who receives. The concern of the law is to distribute water equitably among individual landowners, not —except below 160 acres—in proportion to their holdings of land. This principle is accepted without question by most landholders seeking water under reclamation law; the few who object usually are holders of excess land."

I am in full accord with the views expressed by Professor Taylor and commend the reading of his article in full by those who are interested in this subject.

Since the majority opinion is based upon the wholly unsound and unsupported assumption that the title to the water rights acquired by the United States in the construction, development and operation of the Central Valley Project are held in trust for the use and benefit of the water users of California and that the title to such rights is therefore restricted to the extent that the United States may not dispose of such water pursuant to the Reclamation Act of 1902 and acts amendatory thereto containing the so-called 160-

acre limitation, it follows that the conclusion reached by the majority that the contract here involved deprives certain landowners within the plaintiff irrigation district of vested rights without due process of law and without just compensation is equally unsound and unsupported.

For the reasons hereinabove stated I would reverse the judgment.

The petition of defendant and appellant for a rehearing was denied February 19, 1957. Gibson, C. J., Carter, J., and Traynor, J., were of the opinion that the petition should be granted.